THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIAM REDDEN, Defendant-Appellant.

(No. 72-131;

Third District—April 4, 1973.

890

Stephen P. Hurley, of Defender Project, of Ottawa, for appellant.

Joseph C. Polito, Assistant State's Attorney, of Joliet, for the People.

Mr. PRESIDING JUSTICE ALLOY delivered the opinion of the court:

Defendant William Redden appeals from a sentence imposed upon him for aggravated battery following a jury trial in the circuit court of Will County, where the jury found him guilty. He was sentenced to a term of not less than one nor more than six years in the Illinois State Penitentiary.

It appears from the record that defendant William Redden picked up

Brian Hoag, the 18-month-old son of his fiancee whom he later married. The child was at the grandmother's house. Defendant was to take care of the child during the day and was with him from 10:00 A.M. until 2:45 P.M. on August 9, 1971, when he brought Brian back to the grandmother's house.

The grandmother testified that when Brian was returned to her she noticed that he had blisters on his lips but she noticed nothing else unusual about him and that he was walking. She also stated that about 3:30 P.M. she bathed Brian's face and put vaseline on the blisters, gave him a glass of juice and put him to bed. It appears that after they arrived at the house, defendant and Brian went out in the back yard and played with kittens briefly and then, when defendant got ready to leave, Brian and the grandmother walked over to the car with defendant to say good-by. It appears that about 6:30 P.M. when Brian awoke from his nap, the grandmother undressed him and gave him a bath, and it was then for the first time that she noticed that there were bruises and burns on his body and that his genital area was badly swollen. She took the boy to St. Joseph's Hospital where he was examined by Dr. Fahrner. The doctor testified that he examined Brian between 8:30 and 9:00 P.M. on August 9, 1971, and found blisters on the lips, multiple bruises and burns on the body, and extreme swelling in the genital area. The swelling of the penis and scrotum was approximately to three times the normal size. The doctor stated that the injuries in the genital area could be as new as an hour and a half and probably not more than six hours old. It was the doctor's opinion that the injuries were the result of multiple blows and that the child would have been in great pain and would not have been able to walk because of the pain. It was estimated by the doctor that the maximum swelling would have occurred between one and a half hour and up to three hours after the injury was inflicted.

Defendant was arrested without a warrant at his home on Monday night, August 9, 1971. He was then taken to the county police station and advised of his constitutional rights and questioned from 12:20 A.M. until about 4:00 A.M. by two officers. Defendant's mother and father were at the police station during the entire period but were not allowed to talk with their son. At 4:00 A.M. an officer told them they should go home because defendant was going to be kept in custody overnight and that they should return the next day at 1:30 when defendant would be taken before a magistrate.

The following day, after defendant was again advised of his constitutional rights, the questioning was resumed at 12:30 P.M. by two different police officers. During the interrogation, one police officer, Officer Sicinski, came into the room and asked defendant if he would go to John Reid

& Associates in Chicago to take a polygraph or "lie detector" test. The officer told him that his willingness to take the lie detector test would give an indication of his guilt or innocence. At that point, defendant stated that he wanted to talk to his attorney and have him advise defendant whether or not he should go. The officer told him that if he wanted to talk to his attorney, "that was fine," he could talk to him and take the advice of his attorney. The officer also stated that if defendant voluntarily agreed to go with him he would be released at once and could return of his own volition the next morning for transportation to the lie detector office but that if he did not want to volunteer to go up to the John Reid office he would be held in jail as charged. Defendant agreed to go to Chicago and was released to return to his home.

Defendant returned to the courthouse the next day where the officer asked him if he was still willing to go to Chicago for the lie detector test and he replied that he was. The officer then drove him to the office at which the lie detector test was to be conducted and left him with a Mr. Hunter, a man who was not a police officer, but in the private business of conducting polygraph tests. Defendant was advised and reminded immediately prior to the tests in Chicago of his constitutional rights. Defendant then went into another room with Mr. Hunter, and out of the presence of the police officer, and was interrogated for about an hour. Defendant made an oral confession that he had beaten the child and repeated this confession to Officer Sicinski.

Defendant stated he struck the child in an effort to get the child to call him "daddy" or "Bill" and became angered when the child did not talk to him or acknowledge him. He said that he slapped the child and struck him about the face and body, burned him with a match and kicked him once in the groin area. On each of the three days prior to the beginning of an interrogation, defendant was read his *Miranda* rights and he said he thought he understood his rights, although on the written waiver in response to the statement that he would be furnished an attorney if he could not afford one, he wrote in the space indicating whether he understood, "Yes, I think."

A motion to suppress the confession was made by defendant which was denied by the court. The oral confession that defendant had caused the injuries to the child was admitted in evidence at the trial. Defendant testified at the trial that the first night he was in the police station he was told that the child was on the critical list and was not expected to live; that defendant had never been in jail before and was frightened and had not gotten any sleep while in jail. He said thereafter, before his confession, that he was told that the child was off the critical list. He

stated, also, that he had no recollection of injuring the child and confessed because everyone told him he must have done it since no one else was with the child at the time.

On appeal in this court, defendant raises two issues. First, that it was reversible error to deny defendant's motion to suppress the confession, since defendant asserts that the confession occurred after he had been arrested without a warrant and interrogated for two days before being brought before a judge and after his request to consult with an attorney was ignored by the police. The second contention is that the prosecution failed to prove defendant's guilt beyond a reasonable doubt.

■■ It appears from the record that the oral confession made by the defendant to Mr. Hunter and thereafter again to Officer Sicinski, was not the product of an in-custody interrogation since defendant voluntarily appeared for the polygraph test after he had been released. He had been fully advised of his constitutional rights a number of times. Defendant had the opportunity to consult with counsel prior to his interrogation. As indicated in *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602, a custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. While defendant had been in custody he was released the day before he came in voluntarily to go to Chicago for the polygraph test. He had been away from the police officers for approximately 20 hours. He had ample opportunity to consult with an attorney in the intervening period. While he was at home with his parents, he said he sat around and had coffee with his parents and did not try to get in touch with an attorney although his parents made some such effort. At the trial of this cause he was represented by private counsel and posted a substantial cash bond in the trial court.

When he met the police sergeant, Sicinski, at the courthouse, he was asked whether he was still willing to go to Chicago and said that he was. At the Chicago office of John Reid & Associates, Mr. Fred Hunter of the John Reid company had a conversation with him during which defendant confessed to the beating of the child, Brian Hoag. Mr. Hunter was a private citizen and he and Redden were alone at the time Redden originally confessed. The location was a private office in a private building and no police officer was present in the room. It was only after he had originally confessed to Mr. Hunter, that Redden was asked to repeat his story in front of Officer Sicinski. Redden was not under arrest and not on the jail or police property at the time he made his confession to Mr. Hunter. It is true that the police officer was waiting in the outer

room but he was not in the room in which defendant was being questioned.

■■ Even if defendant was considered to be in custody at the time of his confession, the record indicates that his constitutional rights had been fully explained to him and were effectively waived by him. He did not confess during the prior interrogation in the presence of the police. When he was arrested, he was orally advised of his constitutional rights by one of the police officers and he said he understood his rights. Shortly thereafter at 12:20 A.M. he was again advised of his rights by two of the police officers prior to the questioning and this time he was also handed a written form which he signed, which outlined his rights. He was then questioned for approximately two and a half hours after waiving his constitutional rights. Defendant remained in a cell that night but was not questioned until 12:30 P.M. the following day. Before this interrogation, two deputies again advised him of his constitutional rights at which time defendant also said he understood and did not qualify his answer as to understanding his constitutional rights in any manner. He was then questioned for approximately two and a half hours and was released from custody after making arrangements for a polygraph test as we have indicated. He appeared the next day, some 20 hours later, and agreed that he would go to Chicago for the purpose of having a lie detector test made. He was again advised of his constitutional rights prior to questioning by Mr. Hunter and waived them at that time. In all, he had been advised of his constitutional rights a total of four times.

■■ Defendant Redden had been released on August 10, 1971, at approximately 3:00 P.M. without charge and no bail was required to be set. We see no violation of defendant's rights in the fact that he was not then taken before a judge. He was then released from custody without charge when the arrangement was made to take the lie detector test the following day. Also, as indicated in *People v. Novak,* 33 Ill.2d 343, 348, 211 N.E.2d 235, the so-called *McNabb-Mallory* rule which renders inadmissible confessions taken in violation of the statute requiring appearance before a magistrate would not be applicable in the instant case, since the court in the *Novak* case concluded that "illegal detention" in and of itself does not render inadmissible a confession given during a period of illegal detention, if the confession is voluntarily given. Although it appears that the confession was not a product of an in-custody interrogation, even if we were to assume that the presence of the police officer in the outer office while the polygraph test was being made could be construed as creating a custodial situation, the confession would still be admissible, since defendant's constitutional rights were clearly waived and the confession was obviously voluntary. We, therefore, conclude that the

court did not abuse its discretion in denying the motion to suppress the confession.

■■ On the issue of whether defendant was proven guilty beyond a reasonable doubt, we agree that a confession standing alone would not be sufficient for a conviction without any corroborating evidence, but the corroboration is not required to be sufficient standing alone to support a conviction independent of the confession. *People v. Cunningham,* 122 Ill.App.2d 222, 258 N.E.2d 145; *People v. Hulet,* 66 Ill.App.2d 194, 214 N.E.2d 299.

In the cause before us, Dr. Fahrner testified that the injuries to Brian Hoag could not have occurred in an accidental manner. He also indicated that the injuries could not have been self-inflicted and that the injuries resulted from multiple blows. The record shows that the child was in the custody of defendant from 10:00 A.M. until about 2:45 P.M. and that the child did not have blisters on his lips in the morning, but that he had them on his lips in the afternoon when defendant brought him home. The grandmother also testified that when she undressed the child at about 6:30 P.M. she found the bruises on his body, the burns on his stomach, and that the genital area was badly swollen and bruised. He was taken to St. Joseph's Hospital where he stayed for 16 days.

Another significant bit of evidence was the testimony of Naida Hoag Redden, who was the defendant's wife at the time of the trial and who is the mother of the child. She stated that defendant admitted to her before the polygraph test that he had inflicted the injuries on Brian Hoag. It also appears from the record that there was no express denial that defendant beat the child, but only an expression that the defendant did not "remember."

Defendant argues that Dr. Fahrner's estimate of the time of the injuries would not allow defendant to have caused the injuries because of the time elements involved. We do not believe the record sustains this position, since the doctor's statement involved an estimate, and his estimate is not inconsistent with the injuries and facts as disclosed in the trial. Specifically, defendant contends that the pain after the injuries would not have allowed the child to walk as he was doing when defendant brought him home. The pain would have gotten worse as the swelling in the genital region increased and that swelling, the doctor stated, would take place one half hour to three hours after the injury. It is clear that the child would have been perfectly capable of walking based on the doctor's statement and it is also apparent from what the grandmother stated that the child had a high tolerance for pain.

■■ It is, therefore, our conclusion upon review of the evidence that there was sufficient evidence to sustain defendant's conviction. Certainly

we would not be justified in concluding that the verdict was clearly contrary to the evidence.

For the reasons stated, the judgment of the circuit court of Will County will be affirmed.

Judgment affirmed.

DIXON and SCOTT, JJ., concur.