THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LLOYD LINDSEY, Defendant-Appellant.

First District (2nd Division)    No. 77-757

Opinion filed June 26, 1979.

James J. Doherty, Public Defender, of Chicago (John Thomas Moran, Timothy P. O'Neill, Gail A. Moreland, and John M. Kalnins, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Joan S. Cherry, and Bryan B. Lavine, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

Defendant Lloyd Lindsey (hereinafter "Lindsey") was found guilty of four counts of murder, one count of rape, one count of arson and one count of aggravated battery before one of two juries sitting simultaneously in the same courtroom. Co-defendants Willie Robinson (hereinafter "Robinson") and Eugene Ford (hereinafter "Ford"), whose trials were severed from Lindsey's, were acquitted of similar charges by the second jury. The charges arose from the investigation of a tragic fire which swept through a residence in which four children died, three sisters and a brother, Caroline, age 17, Beatrice, age 14, Cathy, age 11 and Maurice Horace, age 7. Lindsey was found guilty and sentenced to 40 to 80 years in the penitentiary. This appeal is taken from that conviction.

The issues presented for review are whether: (i) defendant was proved guilty of the aforegoing offenses beyond a reasonable doubt; (ii) the trial court erred in refusing to allow a defense motion to impeach one of the eyewitnesses with his mental history and juvenile delinquency; (iii) defendant was denied a fair trial where the prosecution did not inform defendant that one of the eyewitnesses was implicated in the crimes; (iv) defendant was denied a fair trial by the prosecution's use of a prior inconsistent statement as substantive evidence; (v) defendant should have been granted an entirely separate trial based on his intention of calling his co-defendants as alibi witnesses; and (vi) defendant was denied a fair trial where he was convicted by a jury that sat in the same courtroom and simultaneously heard evidence with his co-defendants' jury. The bizarre circumstances revealed by this case require a somewhat extended review of testimony and other evidence.

On October 21, 1974, Mrs. Catherine Horace resided with her six children and a boarder, Lavelle Watkins (hereinafter "Watkins") at 1408 W. 61st Street in Chicago. The two-story house consisted of four bedrooms and a bath on the second floor, and on the first floor a kitchen at the north end, a living room at the south end, and a bath. A basement door was adjacent to a stairway leading to the second story. Entrances to the house were located in the living room and the kitchen. Watkins, age 19,

initially stayed in the basement of the Horace home, but eventually moved upstairs into the northwest bedroom with Charles Horace (hereinafter "Charles") age 13, although he continued to maintain a bed and dresser in the basement. He had been living with the family for four to six months before the fire.

On the evening of Sunday, October 20, Watkins, Mrs. Horace and her family attended services at the Christ Miracle and Healing Center (hereinafter "Church"). Charles was not a member of the Church, although he regularly attended services. Through Mrs. Horace, Watkins was introduced to the Church, where he was "saved and sanctified." The Horace family knew defendants Lindsey, Ford and Robinson through the Church. The wives of Ford and Robinson were members, as was Mrs. Rosie Lindsey, Lloyd's mother, although defendants themselves were not.

Watkins left Church early that Sunday night and returned to the Horace home alone at about 9:30 p.m. Church services concluded at about 1 a.m. and one of the "saints," as members of the Church are called, drove Charles, Beatrice, Caroline, Cathy and Maurice home. Mrs. Horace stayed the night with a friend on the north side of Chicago and Marilyn Horace, her eldest daughter, also spent the night away from the home with a friend. At 2 a.m., Chicago Police Officer Peter Kemmer and his partner followed a fire engine to the Horace home where they saw the first floor in flames. As they arrived, they saw a fireman carry Maurice, still alive, out of the house. He was taken to Englewood Hospital by Officer Klemmer, who then returned to the fire and saw the bodies of Caroline, Beatrice and Cathy being removed from the house. Maurice was transferred to Evanston Hospital where he died of cerebral anoxia due to pulmonary burns on November 2.

Chief Joseph Murray, the ranking fire department officer at the fire, testified that he had to kick in the front door of the house because the door handle was "red hot"; he was unable to get to the interior of the house this way because of the heat. Going around to the back, he entered through the kitchen where the heat and flames were not so intense. As he neared the stairs leading to the second floor, he bumped into the nude body of Caroline positioned in front of the stairs going to the basement, her head lying on the top step leading into the basement and her feet up against the closet wall opposite. Murray's opinion, taking into account the position of the body and the open basement door, was that Caroline had been coming out of the basement at the time she was overcome by smoke. The heat at that location was estimated at "upwards of 170 degrees." He found Maurice upstairs in Charles' bedroom and discovered the bodies of Beatrice and Cathy in the southwest bedroom, one lying on her side on top of the other.

After the fire was under control, Murray saw Watkins and Charles

together at the scene and called to them: "I want to speak to you * * *;" whereupon they looked at him and "kept going." Charles and Watkins were first questioned together by a fireman at a neighbor's home almost immediately after firemen arrived at the scene, when Charles stated that "the furnace blew up, or something." Watkins later testified, "then I agreed with what [Charles] said." Officer Kemmer spoke with Watkins and Charles together later that morning at the hospital and asked them whether they knew how the fire started. Watkins then made no response and Charles simply said "no." Sergeant Daniel Fitzgerald, the police investigator in charge of the Horace fire, also interviewed Watkins and Charles together at the hospital that morning and Charles told him that he and Watkins were asleep in their bedroom when they heard a scream and opened the door to the hallway. The hall was filled with smoke and flames and the pair could not reach the others in the other bedrooms. He and Watkins fled downstairs through the flames and out of the house. Watkins assented to this account. Neither Watkins nor Charles bore any signs of physical injury.

Fred Rice, a member of the Church, spoke to Charles and Watkins separately on the night of the fire. Watkins told Rice that he was in his bedroom when he was awakened by noise and smoke and, unable to get to the girls, fled the house and encountered Charles standing in the backyard. Three days later, he told his stepmother that he had been in the basement when the fire started. Charles' account to Rice was that he had been sleeping in the same bed with Maurice when he saw smoke and fire and then ran from the house. Charles made no mention of Watkins. Mrs. Horace testified that Charles told her he did not know how the fire started. On October 21 Charles and his mother moved in with Reverend Frances Thomas, pastor of the Church. When Rev. Thomas and her son Luther questioned Charles at the Church about how the fire started, he again said he did not know. While they were staying with Pastor Thomas, Mrs. Horace told Charles that she did not understand how he had escaped the fire without any burns. Rev. Thomas also told him that she and many of the Church members did not believe his story.

On the date of the fire, the bodies of all three girls were examined by Dr. Pasqual Culala at the Cook County Morgue who determined that the cause of death of each was smoke inhalation. This was before any charge of rape, arson or murder had been suggested by anyone. No internal examination was performed on any of the three girls at that time.

On the night of the girls' funeral, Luther Thomas and some of the other Church members cornered Charles in the men's washroom at the Church and told him they did not believe his story. Thomas struck him. Defendant Lindsey was also present at this confrontation and was also struck by a Church member.

The inquest into the deaths of the Horace children began on November 25, 1974. Sergeant Fitzgerald, the homicide investigator who had earlier determined that there was no foul play involved in the deaths of the children, spoke again with Charles immediately before the hearing began. Charles reiterated his earlier story; minutes later, however, before the Coroner's Jury, he accused Lindsey, Robinson and Ford of starting the fire. Fitzgerald asked for a recess and the inquest was adjourned. Charles was taken to a police station, where he was later joined by Watkins. Charles and Watkins were interrogated by different officers, but in the same room. Investigator Craig Cegielski testified that he had four conversations with Charles that night, one of which was in the presence of Watkins; and that he had three conversations with Watkins, during one of which Charles was present. Members of the Church were gathered at the police station, but were not in the interrogation room. By their statements Watkins and Charles now accused Ford, Robinson and Lindsey of breaking into the Horace home, strangling two of the girls with a rope, raping all three girls, stabbing Caroline in the neck, bludgeoning Maurice, and setting fire to the house.

Later that evening Lindsey was arrested and brought to the same police station. He was, at that time, age 17. His mother came later and witnessed the taking of his confession. Lindsey first denied any involvement in the fire at the Horace home. Investigator Cegielski told Lindsey that he did not believe him and then gave him a "brief account" of Charles' and Watkins' statements. Lindsey thereafter gave a statement consisting of ten pages, which revealed, in part, the following: He came to the Horace home on the evening in question with Ford and Robinson, having planned only to rape the girls, not to murder them. He looked into the kitchen window and saw Caroline, Cathy, Beatrice, Maurice and Charles. Ford "raised his fist" and Charles "panicked" and ran upstairs. Lindsey and his two companions then came through the front door. They proceeded upstairs to the girls' room and "forced themselves" upon the girls. At this point, Robinson was in another room. Lindsey forced Beatrice "to have sex," and Ford and Robinson forced Caroline and Cathy to do likewise. He saw Ford stab Caroline in the head and strangle Beatrice with a rope. He saw Ford hit Maurice on the head with a stick. Ford then went downstairs to his car and came back into the house with a gas can. He proceeded to spread a substance, either gasoline or kerosene, from the can around the living room and light it. Ford repeated this procedure upstairs. Lindsey thereafter told of seeing Charles and Watkins "running up and down the street," as he and his companions left the scene in their car. This statement was read to the jury after having been authenticated by the court reporter who took it. It had been taken by Assistant State's Attorney Michael R. Epton, and witnessed by Assistant

State's Attorney Joseph Fagan and Investigator Cegielski, in addition to Mrs. Lindsey. The statement was received in evidence and submitted to the Lindsey jury for their consideration.

Lindsey, Ford and Robinson were indicted for rape, murder, aggravated battery, burglary and arson. At their arraignment, all three pled not guilty.

The bodies of Caroline, Beatrice, Cathy and Maurice Horace were exhumed on petition of the State in April of 1975 and were subjected to further examination. Dr. Charles Hirsch, an Ohio pathologist engaged by the State, performed autopsies on each, which he conducted with a view of either corroborating or contradicting the allegations made in the case as related to him by the State. He concluded that the cause of death of each child was carbon monoxide intoxication and smoke inhalation. He found no evidence of hemorrhages or fractures to the structures of the air passages in the necks of the girls who were allegedly strangled by rope, nor of pinpoint hemorrhaging in the eyes, an indicium of strangulation, and was of the opinion that none died of strangulation. His examination of Beatrice and Cathy revealed that neither sustained any injury in the genital area, that each had been a virgin at the time of her death, and that neither had experienced sexual intercourse prior to her death.

With respect to Caroline, he found no evidence of hemorrhaging in the underlying tissues of her neck or head to indicate a penetrating form of injury which might have been caused by a knife blade four and one-half to five inches long having been thrust to its entire depth into her neck, although a superficial cutting or stabbing injury could have been destroyed by the subsequent burning and charring of the tissues in that area. His examination of Caroline's genital area revealed that at some time in the remote past the hymen had been torn or ruptured, which was not to say that she was or was not a virgin. Tearing or rupturing of that delicate membrane can take place in a variety of ways completely unrelated to sexual intercourse. He found no evidence of genital injury; however, this would not preclude the possibility of forceable rape since that term requires mere penetration without accompaniment of glaring bruises, scratches or other injuries. There were no contusions, abrasions or lacerations of the vulva, labia majora or the labia minora. A search for chemical constituents present in semen and a microscopic examination of the vaginal contents for the presence or absence of sperm was out of the question as a practical matter, by virtue of the lapse of time.

Dr. Hirsch examined the remains of Maurice Horace and found evidence of a healing or resolving hemorrhage an inch and a quarter by an inch in diameter situated at the rear part of his head, high up on either side of the midline, within the soft tissues which covered the outside of the skull. There were no recent bruises or hemorrhage of the skin nor of the

brain; however, he did have a brain bruise which was many months old. It was his opinion that the area of hemorrhage at the midline upper portion of Maurice's skull occurred approximately one to three weeks prior to his death as a result of a blunt impact occasioned either by falling and striking his head on a hard object or being struck on the head with a blunt object or instrument.

In July of 1975 Lindsey moved to suppress the oral and written statements taken from him by police and his arrest, on the grounds of lack of voluntariness and lack of probable cause. Following an evidentiary hearing, the motions were denied. Lindsey's motion to suppress statements made by him at the coroner's inquest because his attorney, the public defender, was not notified by the coroner of the date of the inquest, was allowed and that testimony was suppressed.

On the eve of trial, October 20, 1975, the State entered a *nolle prosequi* for each of those counts of the indictment which charged the offenses of aggravated (body) batteries upon Cathy, Beatrice and Caroline, aggravated (deadly weapon) batteries upon Cathy, Beatrice and Caroline, and the rapes of Cathy and Beatrice, which were allowed. On this date, Lindsey's motion for a continuance on the grounds that he was not prepared for trial and of surprise at the dismissal of the aforesaid charges, were denied, notwithstanding his representation that he would forego any motions based upon fourth term discharge. Lindsey also alleged in his motion that he intended to call co-defendants Ford and Robinson as witnesses, which would not be possible if all three were tried jointly. These motions were renewed unsuccessfully during the selection of the Ford-Robinson jury, Lindsey contending that he would be precluded from calling Ford and Robinson as witnesses. Also denied was Lindsey's motion for a complete severance of his case from his co-defendants' trials. His objection to the court's proposed two juries, hearing the cases simultaneously, was overruled.

Also prior to trial, Lindsey filed a motion *in limine* seeking *inter alia*, to use Watkins' juvenile court and mental history record during cross-examination for impeachment purposes if he was found competent to testify. At the evidentiary hearing on the motion, Dr. Donald Paull, a psychologist employed by the public defender's office, testified for Lindsey essentially that Watkins was a highgrade mental defective within the class of "educable mentally handicapped" by the standards of the Chicago school system and that he had been adjudicated a delinquent and committed to Elgin State Hospital. The basis for the juvenile court's involvement was a sexual attack by Watkins upon his mother. A juvenile court psychiatrist had found on December 17, 1970, that Watkins "projected a lack of contact with reality." Watkins' I.Q. was somewhere between 58 and 80 and he had tested as low as 36-51. He was diagnosed in

1972 as having "mental retardation, borderline condition" by the Illinois Department of Mental Health Patient Review section. After examining Watkins himself, the trial judge found him competent to testify and denied defendant's motion to use his juvenile record and mental history to show evidence of previous mental derangement and impairment. Lindsey's subsequent motion for a mistrial on this ground was denied.

For the trial, the court impanelled two juries to sit simultaneously; one jury was assigned to defendant Lindsey, while the other tried Ford and Robinson. Lindsey's jurors were told by the trial judge that they were not "to speculate as to the 'why' it is necessary that this procedure be carried out." This arrangement stemmed from the court's severance of Ford and Robinson from Lindsey. While the selection of the Ford-Robinson jury was proceeding, the trial judge filed a written order setting forth the rules by which the case was to be tried. The order cited judicial economy as justification for the two-jury procedure. The State addressed its opening statement to Lindsey's jury only while the Ford-Robinson jury remained in the jury room. Both juries were present in the courtroom for the State's direct examinations of witnesses having evidence relevant to all three defendants. Cross-examination proceeded according to the order of the indictments; *i.e.*, Lindsey's jury sat outside the courtroom throughout Ford and Robinson's cross-examinations, but then returned to the courtroom to hear Lindsey's cross-examination, during which time the Ford-Robinson jury recessed. Closing arguments were conducted in the same manner as opening statements.

The jury hearing Lindsey's case found him guilty of four counts of murder, one count of aggravated battery of Maurice, one count of rape by accountability of Caroline, and one count of arson. The Ford-Robinson jury found each of those defendants not guilty on all counts.

On the basis of myriad inconsistencies and contradictions in the testimony of Watkins and Charles, Lindsey argues that his conviction is against the manifest weight of the evidence. He emphasizes that his confession was no more than "a garbled regurgitation" of the stories told by Watkins and Charles at the police interrogation. He supports this claim by reference to several aspects common to the stories of all three that were later conclusively refuted, *e.g.*, the rapes of Beatrice and Cathy, the stabbing of Caroline by Ford, and the strangulation of Beatrice. All of these alleged occurrences were rendered incredible by physical evidence and subsequently dropped from the stories of Watkins and Charles, Lindsey asserts, yet he confessed to all of them. Although the State attempts to explain a number of the inconsistencies and contradictions of testimony, it fundamentally relies upon the sanctity of the jury verdict, and upon the principle that, although an unsupported voluntary confession is insufficient to support a conviction, it is enough if other

evidence tends to show that a crime did occur, or otherwise corroborates the confession, relying on *People v. Norcutt* (1970), 44 Ill. 2d 256, 255 N.E.2d 442, and contends that the corroborative evidence likewise need not be sufficient standing alone to support a conviction. *People v. Redden* (1973), 10 Ill. App. 889, 295 N.E.2d 23.

The record reveals that Lindsey did not confess to his complicity in the crimes when he was first brought to the police station; he denied any involvement. It was only after his denial was challenged by the police officer and he was told of what Charles Horace and Lavelle Watkins had accused him of having done that he confessed. In that confession, Lindsey states that when he saw Ford shake his fist at the occupants of the Horace kitchen on the night of the fire, Caroline, Beatrice, Cathy, Maurice and Charles were present in that room. At trial, however, Charles, the only survivor among the kitchen's occupants, testified that only he, Beatrice and Maurice were then present, cooking hot dogs in the kitchen, while Caroline and Cathy went upstairs. It was while Charles and his brother and sister were in the kitchen that he saw Ford "ball up his fist" at the kitchen window. Upon seeing Ford, Charles said nothing to anyone but simply walked out of the kitchen and went upstairs because he "got tired of staying downstairs."

Charles testified at the trial that he went into the southwest bedroom belonging to Beatrice and Cathy. At the preliminary hearing, however, he testified that he went into his own bedroom after he went upstairs and sat by himself for four or five minutes, which he also told the police on November 25, 1974. He then stated that the three defendants appeared at the top of the stairs and grabbed him, forcing him into the southwest bedroom. At trial he testified that the lights in the girls' room were off and that they were in bed asleep. He told the Ford-Robinson jury that no one turned the lights on in the bedroom. When he reported the incident to the police on November 25, he told them that defendants grabbed him and took him into his sisters' room at which time the girls were awake and reading the Bible. Lindsey's confession of November 25 asserts that the girls were in their room at prayer when defendants entered.

Charles told police on November 25, 1974, that Ford raped Caroline after ripping off her clothes and remained on top of her for 15 to 20 minutes. At the trial, Charles said her clothes were not ripped off before she was raped. He testified that "Lindsey * * * got Beatrice on the bed and raped her for ten minutes. When he finished, Eugene [Ford] grabbed me and Willie [Robinson] raped Cathy." Watkins also told the police at that time that Robinson raped Cathy. At the trial Watkins testified he did not see Robinson rape Cathy or Lindsey rape Beatrice. During his testimony at the trial, and for the first time, Watkins stated that he saw Charles assist defendants in raping his sisters. He went to the police

station on November 25 to assure himself that he would not be blamed for the fire. He told police whatever Charles wanted him to say. Except for Charles' involvement as reported by Watkins, Lindsey's confession closely parallels their charges made at the police station on November 25, 1974; not only does he corroborate their assertions of the rapes of Caroline and Cathy, but he confesses that he himself raped Beatrice. Yet, Dr. Hirsch in April 1975 found that both Beatrice and Cathy were virgins at the time they died and had never experienced intercourse. The State, apparently in recognition of the futility of charging rape under these factual circumstances, entered a *nolle prosequi* for each of the indictments relating to the rapes of the two girls on the eve of trial. Notwithstanding that testimony, on cross-examination before the Ford-Robinson jury, Charles testified that he actually saw the rapes of Cathy and Beatrice. Lindsey also confessed by accountability to the rape of Caroline, as testified to by both Charles and Watkins. Dr. Hirsch's testimony concerning his findings with respect to Caroline's body was that: "the hymen * * * had long since sometime in the remote past been torn or ruptured which is not to say that she was not a virgin." He found no evidence of injury in the genital area, vagina, vulva, labia majora or labia minora.

Watkins was the first to tell police on November 25, 1974 that Ford stabbed Caroline with a knife. Charles did not mention a stabbing until police told him what Watkins said, and then he agreed. When interviewed by defense attorneys prior to trial, Watkins told them that he saw the blade of the knife go into Caroline's throat. She was stabbed, he said, while she was lying on the bed and was killed. At the time of the stabbing, Charles reported, Caroline was on the floor and did not thereafter move or make a sound. Caroline's body was actually found on the first floor near the basement steps. Charles saw all of the five-inch blade go into the center, rear nape of Caroline's neck, and saw her bleeding from the wound. Watkins saw the same five-inch blade go into the front, left side of her neck. Watkins testified that after the stabbing, he was chased into his room by two men with razors who threatened to kill him. Later, he said he saw no razor and saw no one behind him. Lindsey stated in his confession that Ford stabbed Caroline in the head. Dr. Hirsch found no stab wound either in Caroline's neck, front or back, or her head. He dissected the front and back of her neck as well as the back area of the head and found no evidence of hemorrhaging. It was his opinion that if she had received a knife wound such as that described, notwithstanding the burned condition of her body, he would have discovered it.

When Charles and Watkins were interviewed by police on November 25, 1974, they reported that both Cathy and Beatrice were strangled with ropes wielded by Robinson and Lindsey respectively. In

Lindsey's confession, he stated that Ford strangled Beatrice with a rope. Dr. Hirsch found no evidence of either ligature strangulation or manual strangulation on their bodies. The State entered a *nolle prosequi* of the indictment alleging the strangulation of Beatrice. Charles did not testify that she was strangled at the trial. Watkins asserted that he never saw the alleged stranglings but merely repeated what Charles had told him to tell the police.

Watkins testified at the trial that Lindsey struck Maurice two or more times over the head with an iron pipe. Charles testified that he was sure Lindsey struck Maurice once with a wooden stick. Charles saw Lindsey strike Maurice on the back of the head below the crown, at which time Lindsey was standing behind Maurice. Watkins saw Lindsey strike Maurice directly on the back of the head at the base of the skull, at which time the two were facing each other. Watkins also told a defense attorney that Maurice was struck first on one side of the head and then on the other side. In Lindsey's confession, it was Ford who struck Maurice in the head with a stick like a leg from a piece of furniture. Dr. Hirsch found no trauma to Maurice's head in the places where Watkins indicated Lindsey had struck him. He did discover a "healing" hemorrhage in the upper center back of the head where the part of the hair ends, the cause of which could have been a fall, or having been struck with a blunt object or instrument, or "five thousand different explanations for that" injury.

Charles stated the three defendants brought a silver, gallon-size gas can with red lettering into the house and, after emptying its contents upstairs and downstairs, and lighting the fire, saw them leave it in the living room before they went out. Watkins never mentioned a gas can in any of his statements or testimony. Chief Murray, one of the first to enter the house in responding to the fire, characterized the cause of fire as "undetermined" and found no evidence suggesting arson. He testified that Second Deputy Prohaska and Chief Meiling reached the same conclusion. Chief Murray did not smell the odor of an accelerant such as gasoline, kerosene or naphtha in the house. He found no can or container suitable for holding such an accelerant. He made no request for an arson investigation. John Lukitch, a photographer for the arson investigation unit of the Chicago Fire Department, took photographs of the home after the fire. One photo of the stairway leading from the first floor to the second, suggested burning down low, at the baseboard, which could be considered unusual because fire ordinarily travels upward; however, if the fire turned around the corner on its way up the stairs, the stairwell wall could have deflected the flame downward to cause that effect. The police arson squad came to the scene as a matter of routine because deaths were involved. Officer Isador Pedraza of the bomb and arson unit concluded in his report that the fire was "accidental." After viewing the stairway

photograph taken by Lukitch, Pedraza testified that the burning shown on the hall stairs would not be consistent with the theory that the fire's point of origin was in the living room. Two points of origin of a fire, he said, would be suspicious. It is important to note, however, that no one testified that there were two such points of origin in the fire.

■■ The foregoing analysis shows the conflicting and irreconcilable character of the material evidence. Ordinarily, the determination of the issues in this case, therefore, would be for the jury; however, we are bound to examine the evidence in a criminal case such as this as we have in the preceding paragraphs, and if we find it to be so improbable or unsatisfactory as to raise a serious doubt of defendant's guilt, the conviction must be reversed. (*People v. Coulson* (1958), 13 Ill. 2d 290, 296, 149 N.E.2d 96.) In that case the supreme court, in reversing a robbery conviction by a jury, stated further:

> "A judgment of conviction can be sustained only on credible evidence which removes all reasonable doubt of the guilt of the defendant, and it is the insufficiency of the People's evidence which creates such doubt. If a conviction is to be sustained, it must rest on the strength of the People's case and not on the weakness of the defendant's case. (*People v. Widmayer*, 402 Ill. 143; *People v. Cullotta*, 376 Ill. 333; *People v. Washington*, 327 Ill. 152.) The foregoing principle of law is a corollary of the presumption of innocence to which a defendant in a criminal case is entitled, and to the rule that the People have the burden of establishing the defendant's guilt beyond a reasonable doubt." (13 Ill. 2d 290, 296, 149 N.E.2d 96.)

The State correctly argues that great weight must be given to the findings of the triers of fact. In a case such as this, however, where the totality of the circumstances leaves a reasonable doubt as to the defendant's guilt, the conviction cannot stand. (*People v. Reese* (1966), 34 Ill. 2d 77, 80, 213 N.E.2d 526.) Where, as here, the record leaves the reviewing court with grave and substantial doubt of guilt, the conviction must be set aside. *People v. Powell* (1977), 48 Ill. App. 3d 723, 729, 362 N.E.2d 1329.

■■■ The State maintains that "the People's case is strong," and that "the evidence against Lloyd Lindsey is complete and leaves no room for doubt," relying almost completely upon the testimony of Charles Horace and Lavelle Watkins. We disagree. The inconsistencies in the testimony of Charles and Watkins were not only contradictory but diluted this evidence to the level of palpable improbability and incredulity, thereby creating a reasonable doubt as to his guilt. (*People v. Springs* (1972), 51 Ill. 2d 418, 283 N.E.2d 225.) The preclusion from consideration by the jury of Watkins' mental history was erroneous. He was the only eyewitness to the alleged crimes who was not directly implicated in their

commission. His testimony was pivotal. The jury should have been allowed to evaluate his testimony in light of that history for the purpose of assessing his ability to observe, recall and relate. His having been found competent to testify by the trial judge is a separate legal issue not involved in the credibility appraisal which was the responsibility of the jury. *Schneiderman v. Interstate Transit Lines, Inc.* (1946), 394 Ill. 569, 577, 69 N.E.2d 293.

Testimony describing the rapes of two girls later found to be virgins; a stabbing of which there was no supporting evidence; strangulation by rope of which there was no evidence; arson by use of an accelerant for which there was no supporting testimony; and aggravated assault on parts of a body which bore equivocal evidence of such an injury leaves this case in a posture similar to that described by the supreme court in *People v. Coulson* when it said, "this testimony taxes [even] the gullibility of the credulous." (13 Ill. 2d 290, 296.) Equally unsupportable is the putative confession which parroted the initial reports given by Charles and Watkins to the police after Lindsey was informed of what they said. Nor does the evidence in this case support beyond a reasonable doubt Lindsey's guilt of Caroline's rape by accountability. It is noteworthy that the jury hearing the Ford-Robinson trial, which considered substantially the same evidence, acquitted both defendants of all charges in that case, Ford having there been charged with the actual rape of Caroline, which buttresses this conclusion. See *People v. Carter* (1974), 19 Ill. App. 3d 21, 23, 311 N.E.2d 213.

■■ Because we reverse the conviction of Lindsey on all counts, it is unnecessary to reach the remaining issues presented in the appeal. Further, since there is nothing in the record to indicate that any different or additional evidence could be presented by the State should this case be remanded for a new trial, we reverse the judgment of conviction without remand.

Reversed.

STAMOS, P. J., and DOWNING, J., concur.