THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
TYRONE WALTON, Defendant-Appellant.

Fourth District  No. 17382

Opinion filed July 8, 1982.

Daniel D. Yuhas and Diana N. Cherry, both of State Appellate Defender's Office, of Springfield, for appellant.

Ronald C. Dozier, State's Attorney, of Bloomington (Robert J. Biderman and Garry W. Bryan, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MILLS delivered the opinion of the court:
Armed robbery—jury—guilty—25 years.

Walton was identified by his victim, who had been hospitalized for a nervous disorder *prior* to the robbery.

Motion for discovery of the victim's mental health records in the possession of State agencies was denied.

We affirm.

## FACTS

Because of the issues raised by defendant on appeal, the facts of this case may be stated in somewhat abridged form.

At approximately 1 p.m., on February 12, 1981, the victim, of Bloomington, was robbed at gunpoint while walking in the vicinity of his home. The robber engaged him in conversation prior to the robbery, but according to the victim, the entire incident took no more than 10 or 15 minutes. After he was robbed, he went immediately to his home and reported the incident to police. He described his assailant as a black man of slim build, approximately six feet in height, weighing 150 or 160 pounds. The robber wore a long tweed trench coat and a stocking cap, and was approximately 20 years old. Officer Frank, of the Bloomington police department stated that when he first arrived at the victim's residence following the robbery, the victim was highly agitated, shaking, and spoke with a nervous voice.

Shortly after the robbery, Officer Bauer, who had heard a radio report of the incident, noticed that a short black male appeared to be

leaning forward and stuffing something under the front seat of a suspicious automobile driven by a taller black male which the officer was following. Bauer stopped the vehicle and ordered the two occupants out. The car was driven by defendant, and the other occupant was Jimmie Dale Hannah, who was known by Bauer to have a revoked driver's license. Bauer subsequently discovered a tweed coat on the floor of the car where Hannah's legs would have been. He checked the coat for identification and found a stocking hat, a pair of gloves, and a billfold containing the victim's identification papers. The defendant was thereupon arrested and placed in a holding cell at the Bloomington police station.

Less than 75 minutes after the robbery, the victim was brought into the Bloomington police station's cellblock area. He had previously been shown his wallet, which police told him was taken from a suspect who was in custody. As soon as he saw defendant, he pointed at him and said, "That's him. That's him." The defendant was apparently the only person in the cellblock at the time and was the only suspect shown to the victim. The defendant was not wearing an overcoat or hat at the time the victim identified him. Persons arrested by the Bloomington police department are normally taken to the McLean County jail when they are to be held in custody for more than a short period of time, and lineups usually take place there. It usually takes from one to three hours to organize a lineup.

At a hearing on defendant's motion to suppress the victim's identification of defendant at the showup and the fruits of the search of the automobile which defendant was driving when arrested, the victim stated that he really was not certain whether he had seen defendant prior to the robbery, since a lot of black people look alike. He also stated that on the afternoon of the robbery, he was in no hurry to leave the police department.

At trial of this cause, he also made an in-court identification of defendant and stated that defendant was the person who accosted him. Under cross-examination, he acknowledged that the defendant was "not really" slim, that he appeared approximately six feet two to six feet three inches tall, weighed approximately 170 pounds and was approximately 23 to 25 years old. He further testified that he was convicted of burglary in 1971 and that for the past five or six years had periodically been under a doctor's care for his "nerves." He had voluntarily been a resident in a Decatur mental hospital, where he underwent treatment for his nervous condition, from November 1980 to January 1981. He had never been involuntarily committed to a State hospital. When his nerves got "real bad" they caused him "not to think too good," but he was "completely right" on February 12, 1981. He also described the medication which he took as part of his treatment.

OPINION

■■■ I. Defendant first contends that the pretrial showup was improperly suggestive and that evidence of this identification was therefore improperly admitted at his trial. Pretrial identifications which are overly suggestive are not *per se* violative of a defendant's confrontation and due process rights. Evidence of such identifications is admissible if, based on the totality of the circumstances, the identification possesses sufficient indicia of reliability. The relevant factors in evaluating the reliability of such identifications are: (1) the opportunity of the witness to view the defendant at the time of the crime; (2) the witness' degree of attention to the details of the crime and the criminal; (3) the accuracy of the witness' preidentification description of the criminal; (4) the level of certainty demonstrated by the witness in identifying the defendant as the culprit; and (5) the amount of time elapsed between the commission of the crime and the identification. Against these factors must be weighed the corrupting effect of the suggestive identification. (*Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243.) Furthermore, a one-man showup within a short time of the commission of a crime is to a certain extent justified by the necessity for the police to determine whether the perpetrator of the crime has been apprehended, so that they may know whether to continue the search for the culprit. *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.

■■ An analysis of the circumstances surrounding the victim's pretrial identification of defendant reveals that the identification contains sufficient manifestations of reliability, and was sufficiently justified by exigent circumstances, to satisfy constitutional standards for admissibility. First of all, he had a clear view of defendant for at least five to 10 minutes while standing outside in the early afternoon. He thus had ample opportunity to view the defendant at the time of the robbery. Furthermore, the witness and defendant were alone at the time of the robbery, and his attention was thus obviously focused on defendant. Also, he provided a rather accurate description of defendant, including a description of his height, weight, and wearing apparel. Upon first seeing defendant in the cellblock, he spontaneously identified him as his robber, thus signifying that he was completely certain of his identification. Also, he provided a description of the robber to the police within a half-hour of the crime and identified defendant as the robber within 75 minutes of the incident. Finally, booking defendant into the McLean County jail and organizing a lineup would obviously have resulted in a rather considerable delay in his viewing of defendant. Thus, the indicia of the reliability of his identification of defendant, coupled with the need for the police to promptly

determine whether his robber had been apprehended, outweigh any prejudice accruing to defendant as a result of the suggestiveness of the pretrial identification procedure. The trial court did not err in admitting evidence of the showup.

■■■ II. Defendant also maintains that the victim's in-court identification was improper, since it was tainted by the allegedly suggestive police station identification. In order for an in-court identification to be admissible, it must meet the same five-factor test of reliability set forth in *Manson*, augmented by a sixth factor which the Illinois Supreme Court has appended to the standard: the extent of any prior acquaintance of the witness with the defendant. Furthermore, the in-court identification must have an origin independent of any improper out-of-court identifications. (*People v. McTush* (1980), 81 Ill. 2d 513, 410 N.E.2d 861.) As previously indicated, the circumstances of his encounter with defendant fully satisfy the first and second prongs of the *Manson* test. The victim did not demonstrate any uncertainty in his courtroom identification of defendant, and a not unreasonable amount of time elapsed between the robbery and the trial. Furthermore, there is some evidence that the victim may have known (or at least seen) the defendant prior to the robbery. The minor discrepancies in his description of defendant on the day of the robbery and his description of defendant at trial, which essentially amount to a difference in the estimate of defendant's weight of approximately 20 pounds, and a difference in the estimate of defendant's height of two to three inches, are immaterial in view of the other factors which support the reliability of the victim's identification. (*Cf. People v. Nolden* (1980), 91 Ill. App. 3d 532, 414 N.E.2d 1124 (minor discrepancies in initial description of defendant which crime victim provided police and defendant's actual physical characteristics do not raise reasonable doubt as to perpetrator's identity; instead such inconsistencies are to be weighed by the trier of fact in evaluating identification testimony).) Since the victim's in-court identification of defendant thus possesses sufficient indicia of reliability, and did not stem from an improper out-of-court identification, the trial court acted properly in permitting this identification.

III. Defendant finally asserts that he should have been granted access to the victim's health records, which were in the possession of State agencies. On May 4, 1981, defendant filed a motion for discovery of this material, which was denied by the trial court on May 5, 1981. On May 20, 1981, the defendant filed a subpoena for "any and all medical records relating to the mental status of one [victim]" in the possession of the McLean County Center for Human Services, but compliance with this subpoena was not ordered. Defendant, relying exclusively on this court's recent decision in *People v. Phipps* (1981), 98 Ill. App. 3d 413, 424 N.E.2d 727, asserts that the trial court's refusal to provide him with access to the

victim's mental health records amounts to reversible error. We find *Phipps* distinguishable, however.

In *Phipps*, the defendant was charged with cruelty to persons, maltreatment of a mentally retarded person, and battery. The defendant's motion for discovery of mental health records asserted that seven of the witnesses which the State planned to call against defendant were residents of the Lincoln Developmental Center, that the State maintained personnel files on those individuals, and that the files contained mental evaluations, intelligence quotients, and statements concerning the truth and veracity of the witnesses. We held that under the circumstances there present, the defendant's constitutional rights of due process and confrontation mandated disclosure of the relevant portions of the mental health records of the witnesses confined to the Lincoln Developmental Center, notwithstanding the mental health therapist-patient privilege. Ill. Rev. Stat. 1981, ch. 91½, par. 810(a).

Prior to *Phipps*, Illinois courts held that evidence of a witness' mental condition is admissible to the extent that it bears on the credibility of the witness' testimony. (See *People v. Lindsey* (1979), 73 Ill. App. 3d 436, 392 N.E.2d 278.) Before such evidence may be introduced, however, its relevance to a witness' credibility must be established. (*State v. Harman* (W. Va. 1980), 270 S.E.2d 146; see *People v. Brown* (1966), 76 Ill. App. 2d 362, 222 N.E.2d 227.) We do not deem the rule of *Phipps* to be so broad as to negate the necessity of establishing the pertinence of a witness' psychiatric condition or history to the credibility of his or her testimony before such evidence may be introduced or before a witness' otherwise confidential mental health records may be subpoenaed or discovered.

■■ The witnesses involved in the *Phipps* case, whose mental health records the defendant sought to obtain, suffered from psychiatric disorders so severe that they were long-term residents of a mental hospital. They were institutionalized at both the time of the alleged offenses and the time of the trial. In the case at bar, by contrast, the defendant had once been a voluntary patient in a mental hospital, but apparently had successfully completed his treatment there. He was not hospitalized at either the time of the robbery, the time of defendant's trial, or during the intervening period. Aside from the victim's testimony as to his nervous condition and prior treatment therefor, the only other evidence offered in support of defendant's effort to obtain access to the victim's mental health records was the statement of defendant's counsel, while arguing defendant's motion for discovery of those records, that the victim was "under medical supervision by the McLean County Center for Human Services." The defendant's evidence in support of his motion to discover, and his subpoena for the victim's mental health records is obviously not comparable, in either its substance or the specificity of the allegations as to the

contents of the victim's mental health records, to that offered in support of Phipps' discovery motion. It falls short of the type of evidence which would have been necessary to establish the relevancy of the information contained in the victim's mental health records to his credibility as a witness.

We therefore hold that on the basis of the record before us, the defendant did not make a sufficient showing that information contained in the victim's mental health records in the possession of State agencies was relevant to his credibility as a witness.

Affirmed.

GREEN, P. J., and TRAPP, J., concur.