THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHNNY PLUMMER, Defendant-Appellant.

First District (2nd Division)   No. 1—98—1007

Opinion filed December 26, 2000.

Rita A. Fry, Public Defender, of Chicago (Thomas F. Finegan, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Alan J. Spellberg, and Michele I. Lavin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

Defendant, Johnny Plummer, was indicted for first degree murder and attempted armed robbery pursuant to sections 9—1, 8—4, and 18—2 of the Criminal Code of 1961 (720 ILCS 5/9—1, 8—4, 18—2 (West 1992)). He was sentenced to natural life imprisonment and a term of five years' imprisonment, both to run concurrently with his prior natural life sentence. On appeal, defendant contends that: (1) the State did not meet its burden of proving him guilty beyond a reasonable doubt; (2) the judge abused his discretion and deprived him of a fair trial when the prosecution presented details of his other crimes; and (3) the trial court erred by precluding the cross-examination of a key prosecution witness.

We affirm.

## BACKGROUND

On June 17, 1991, at about 2 a.m., Mrs. Jeanette Pole and Mrs. Perrijean East were driving southbound on Halsted Street in Chicago, Illinois. While sitting at the stoplight on the corner of 63rd and Halsted, Mrs. Pole heard a male voice coming from the right passenger side of the vehicle. However, Mrs. Pole could not understand exactly what was being said. When Mrs. Pole looked toward the window, she

saw a gun held by a black hand, the man's right hand, sticking through the window. She could not see the man's shoulders or head as he pointed the gun inside the car.

Mrs. Pole attempted to raise the window and drive away. However, her 54-year-old passenger, Mrs. East, was shot once in the head. Mrs. Pole immediately drove her to the emergency room of St. Bernard Hospital. Mrs. Pole spoke to a police officer, and after her car was driven by the police to the emergency room entrance, she was not allowed to go near her car. The vehicle was parked in front of the hospital where it was searched and tested for fingerprints. The police were able to retrieve one fingerprint and one palm print from the top of the car on the passenger side of Mrs. Pole's car.

The State filed a pretrial motion to introduce evidence of defendant's other crimes and arrests. The State's motion articulated that the other crimes evidence would be used for the following purposes: (1) to establish the identity of the defendant as the perpetrator of Mrs. East's murder; (2) to establish the reliability of the State's key witness's handwritten statement; (3) to establish that defendant possessed a gun; and (4) to establish that defendant frequented the area of the murder. The trial judge allowed the testimony at trial, for limited purposes.

At trial, one of the prosecution's key witnesses was Erica Frazier. She was serving a three-year sentence for forgery in Wisconsin at the time of her testimony. Frazier testified that on June 16, 1991, at about 9 p.m., she saw defendant and Malcolm Sharkey on the corner of 59th and Union sitting on the porch in the middle of the block where she had seen them on numerous occasions. On that night, they were selling drugs and she saw a gun hidden in the grass, a gun that she had seen "all the time."

Frazier testified that, at about 9:40 p.m., she overheard a conversation between defendant and Sharkey. Defendant stated that he hoped somebody was "walking along" so he could stick him up for his gold herringbone chain. She also overheard defendant mention that he hoped a rival gang member would stop at a stoplight so that he could rob him of his chain. She then testified that the men escorted her toward home, going southbound on Halsted until she got to 61st Street. The next morning, June 17, 1991, Sharkey stopped by Frazier's home, briefly.

Frazier testified that, two days after the shooting, defendant and Sharkey were at her home. Frazier jokingly told defendant that she knew he was the one who committed the murder and that the victim was her cousin. Frazier also testified that, after defendant heard this, he apologized to her. Frazier noticed that he was unusually quiet after

that. Eventually, she told him that she was only kidding and that the victim was not her cousin. She observed that defendant seemed relieved.

During trial, an *in camera* examination of Frazier was heard outside the presence of the jury regarding her suicide attempt and subsequent five-day hospitalization for depression in 1990. She testified that after her hospitalization she was not medicated for her depression. She also testified that she did not have any problems with her memory and did not suffer from hallucinations or an inability to distinguish fantasy from reality. The defense requested to cross-examine Ms. Frazier in the presence of the jury. The trial court denied defendant's request. The court explained that the defense failed to demonstrate the relevance of such inquiries.

The victim's granddaughter, Ms. Mills, testified at trial as to her conversation with Ms. Frazier in April of 1992 at Mills' home. By chance, Mills and Frazier lived in the same apartment complex and became friends. Mills testified that while Frazier was visiting Mills in April of 1992, the murder of Mrs. East came up. In their conversation, they concluded that Ms. Mills' grandmother was the victim of the shooting that Ms. Frazier claimed to have details about. Defendant was not arrested until almost 10 months after the murder.

During the State's case in chief, the medical examiner testified that there was no partially burned gunpowder residue on Mrs. East's skin surface or hair that would indicate that the weapon was held at close range at the time of firing. He explained that if a handgun was shot at the distance of 18 to 24 inches from the surface of the body or if the bullet passed through a door or glass prior to striking the victim, there would be no evidence of such "tatooing or stippling."

As an expert in the field of fingerprint identification, Officer Brewer of the Chicago police department testified that the latent fingerprint and palm print, which were obtained from the exterior passenger side of the car, matched those of the defendant's left hand. It was elicited that Mrs. Pole had owned her car for approximately five years and was in the routine of washing it once a month. She stated that she did not frequent the area of the murder and probably had not been there in about a year. In June 1991, she had been parking her car on the street.

Frank Wachowski, who at the time of the shooting recorded data regarding the weather reporting station at Midway Airport on a volunteer basis, testified that in June 1991 there was only a trace amount of rainfall.

To establish defendant's identification, the State presented evidence of defendant's other crimes and arrests. Officer Dixon was called

by the State to testify regarding a March 1991 arrest of defendant. The trial court admonished the jury, and the State conducted the following direct examination, in pertinent part, of Officer Dixon:

"THE COURT: Ladies and gentlemen, the evidence you're about to receive is that the Defendant has been involved in offenses other than those charged in the indictment. This evidence is to be received on the issues of the Defendant's identification and may be considered by you only for that limited purpose.

\* \* \*

Q. Now officer, I would like to direct your attention back to March the 16th of 1991, were you working on that particular date?

A. Yes, I was.

\* \* \*

Q. Now, Officer, I'd like to direct your attention specifically to approximately 10:40 on the evening of March 16th, 1991, can you tell us where you were at that time?

A. I was in the vicinity of 59th and Emerald.

Q. Can you tell us, Officer, why you were at that location?

A. Because at that time there was an area of high narcotics traffic.

\* \* \*

Q. Can you tell me as you were driving through that alley did you observe anything?

A. Yes, I did.

Q. Can you tell me what it is you observed?

A. I observed two subjects standing at the corner of the east alley of Emerald, it's a T alley, east corner of Emerald, make a hand to hand exchange.

Q. Officer, based on your experience as a Chicago Police Officer can you tell us what you believe was taking place when you saw this hand to hand exchange?

A. I believe it to be an illegal narcotics transaction.

\* \* \*

Q. Can you tell me when you made this observation what happened next?

A. At that time these two subjects looked in the direction of my squad car and both fled on foot.

Q. Did you pursue them?

A. Yes, I did.

\* \* \*

Q. Tell me where the pursuit took you? [sic]

A. It took me through the alley, through the south alley of 59th, west to Emerald, at that time when the subjects split up the one subject turned north on Emerald and ran north across 59th street with me in the squad car in pursuit of him. At that time as we hit

the corner of 59th and Emerald, this Defendant ran into the Maxwell Restaurant, 5859 South Emerald.

Q. Roughly in the intersection of 59th and Emerald?

A. Yes.

Q. Did you pull your squad up to the Maxwell Restaurant?

A. Yes.

Q. Tell me what happened once your squad car got right up to the entrance of Maxwell Street entrance? [*sic*]

A. As I stopped the car at the restaurant this subject ran into the door of the restaurant, at which time he threw down a clear plastic bag, as I exited the car and ran in the restaurant behind him I retrieved the bag.

Q. The person that you observed making this hand to hand transaction that you chased and then observed drop a clear plastic bag do you see that person in the courtroom today?

A. Yes.

Q. Can you identify him by something he's wearing today in Court?

A. Yes, the young man with the cream colored shirt and glasses.

MR. DILLION: May the record reflect the in-Court identification of the Defendant Johnny Plummer.

* * *

Q. Could you tell me what was inside that plastic bag that was dropped to the ground?

A. Six smaller clear blue plastic bags containing white rocky substance which I believed to be cocaine.

Q. At that time did you place the Defendant under arrest?

A. Yes, I did.

Q. Could you tell me as you searched him what you found?

A. I found $297.00 in currency on his person.

Q. Was he placed under arrest?

A. Yes, he was.

* * *

Q. Specifically, you learned his name was Johnny Plummer, is that correct?

A. Correct.

Q. Did you learn from him whether or not he had a nickname?

A. Yes, I did.

Q. Can you tell me what his nickname was as told by him to you?

A. Smokey.

Q. Did you also question the Defendant as to whether or not he belonged to a gang?

A. Yes, I did.

Q. Can you tell me what he indicated to you?

A. He said he was a GD.

Q. And, Officer, based on your experience as a police officer in the 7th district what did you understand that to mean when he said he was a GD?

A. Gangster Disciple.

Q. And that's a street gang that's common in the 7th district at that time, March of 1991?

A. Yes.

Q. Officer, I'd like to show you what I previously marked as People's Exhibit twenty-five for identification, does this appear to be an area depicted on this of 59th and Emerald where these events took place?"

The State's next "other crimes" witness was Officer Clifton. The following direct examination, in pertinent part, was conducted of Officer Clifton:

"Q. Back in February of 1991 how long had you been assigned to the Tactical Division?

A. Three years.

Q. In the Tactical Division, do you wear uniforms such as you're wearing today or do you wear civilian clothes?

A. Mostly we wear civilian dress. There are occasions where we do wear uniforms.

Q. On February the 18th of 1991 at approximately 10:30 in the evening do you remember where you were at that time?

A. Yes, I do.

Q. Where were you?

A. I was on patrol in the 7th District, approximately around 59th and Halsted.

\* \* \*

Q. Around the area of 59th and Union did you receive any information or complaint?

A. We received a complaint from a citizen as to some individuals at 59th and Peoria.

Q. Peoria?

A. I'm sorry, 59th and Union, excuse me.

\* \* \*

Q. As you walked northbound on Union towards 59th Street, did you see anything?

A. Yes, we seen five individuals standing at 5933 South Union.

Q. As you were approaching them did you notice anything unusual about the five individuals that you saw?

A. One of the individuals as we were approaching the five had at [*sic*] chrome revolver in his hand, he was the second individual that was closet [*sic*] to us as we were approaching.

Q. Now, again, you're approaching and wearing civilian clothes, is that correct?

A. Yes.

Q. What did you do when you saw one of the people had a gun?

A. Myself and my partner announced our office, after we announced our office the five individuals then broke and ran.

\* \* \*

Q. What happened as you followed those three individuals?

A. We also noticed that another individual had a weapon in his hand.

Q. Now, the person, the second person with the gun in his hand, you later learned that person's name?

A. That's correct.

Q. What did you learn that person's name to be?

A. During the arrest we learned his name was Dwight Smith.

Q. The person that gave you the name of Dwight Smith do you see him in the courtroom today?

A. Yes, I do.

\* \* \*

Q. As you chased the person that gave you the name Smith and the other person with a revolver and a third person, what happened next?

A. That one individual that was the last person to run into the house, he had dropped a package, I was able to grab him by the collar, my partner was able to retrieve what he had dropped to the ground, we then followed the other individuals, two individuals into the house where they had located themselves on the second floor in the house.

\* \* \*

Q. Now, the Defendant who is sitting in the courtroom today, who gave you the name of Dwight Smith, did you learn his real name?

A. Yes.

Q. What did you learn it to be?

A. Johnny Plummer.

Q. When you saw him in the bedroom was there any objects near him?

A. Yes, there was.

Q. What was near him?

A. On the floor next to his foot was a plastic bag with the weapon that I saw was in his hand as he was running.

Q. During booking procedures did you ask Mr. Plummer—did you ask him his name?

A. Yes, we did.

Q. What name did he give?

A. He gave me Dwight Smith.

Q. Did you ask him his address?

A. Yes, I did.

Q. What address did he give you?

A. He gave me an address of 5231 South Marshfield.

Q. Did you later learn his real name to be Johnny Plummer, is that correct?

A. That's correct.

Q. And also during the time you were booking him did you ask him if he was affiliated with any street gangs?

A. Yes, I did.

Q. What did he tell you?

A. Gangster Disciple.

Q. Now, the area of 52nd and Marshfield, can you tell us approximately how far that is away from 73rd and Green?

A. Approximately three and a half miles."

At the end of the State's case in chief, the defendant made a motion for directed finding. The motion was denied. The defense then presented its evidence.

Detective Graf of the Chicago police department was called by the defense. He testified that he spoke with Ms. Frazier via telephone and in person in April of 1992 concerning her knowledge of the murder. He stated that Ms. Frazier informed him of a conversation she had with Plummer the night before the murder as he walked her southbound on Halsted. She did not tell him about a conversation with defendant while waiting for him and Sharkey at 59th and Union. Detective Graf also stated that Frazier did not mention to him the conversation that she alleges took place between her and defendant after the shooting.

The defense rested. Defendant was found guilty of first degree murder and attempted armed robbery. Defendant made a motion for a new trial. The motion was denied.

## ANALYSIS

### I

■ Defendant initially argues that the fingerprint evidence and the testimony of Ms. Frazier were insufficient to establish his guilt beyond a reasonable doubt. The State responds that, considering the logical time that the defendant's prints could have been placed on the car and witnesses' testimony, any reasonable trier of fact could have found defendant guilty beyond a reasonable doubt.

It is well established in Illinois that "it is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses' testimony." *Maple v. Gustafson*, 151 Ill. 2d 445, 452, 603 N.E.2d 508

(1992). A determination by the jury will not be set aside unless the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt as to the defendant's guilt. *People v. Jayne*, 52 Ill. App. 3d 990, 1016, 368 N.E.2d 422 (1977). On review, this court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985).

In the instant case, although it could not be determined when the palm print and fingerprint were placed on the vehicle, a forensic scientist matched the fingerprints found with those of the defendant. Mrs. Pole testified that she had not driven her car to the area of the shooting in over a year. She also testified that she customarily washed her car about once a month. The defense presented alternate methods by which Plummer's fingerprints could have been placed on the car. The defense also called Ms. Frazier's credibility into question. However, a review of the record indicates that a reasonable jury could have found the evidence sufficient to establish defendant's guilt beyond a reasonable doubt.

## II

Defendant's next major contention is that the trial court abused its discretion and denied defendant a fair trial by permitting other crimes evidence to be admitted. He contends that he was denied a fair trial when detailed facts of those arrests were elicited. The State responds that: (1) the court properly allowed such evidence for identification of the shooter; (2) the court properly allowed such evidence for placing defendant in the vicinity of the murder; and (3) the jury was instructed to use that evidence for those limited purposes.

■ While the law distrusts the inference that because a person has committed other crimes he is more likely to have committed the crime charged, evidence of other crimes is admissible if it is relevant for any purpose other than to show the defendant's character or propensity to commit crime. *People v. Kimbrough*, 138 Ill. App. 3d 481, 484, 485 N.E.2d 1292 (1985). Evidence of the defendant's commission of other crimes is admissible to show *modus operandi*, intent, identity, motive, or absence of mistake. *People v. Kliner*, 185 Ill. 2d 81, 146, 705 N.E.2d 850, 883 (1998).

The admissibility of other crimes evidence rests within the sound discretion of the trial court. *People v. Heard*, 187 Ill. 2d 36, 58, 718 N.E.2d 58 (1999). A trial judge should consider whether the evidence is actually necessary in light of the availability of other methods of establishing the facts at issue. *People v. Thigpen*, 306 Ill. App. 3d 29,

36, 713 N.E.2d 633 (1999). In considering the admissibility of other crimes evidence, the trial judge must weigh its probative value against its prejudicial effect on the defendant and may exclude the evidence if its prejudicial effect substantially outweighs its probative value. *Kliner*, 185 Ill. 2d at 146. The trial court's decision will not be overturned absent a clear abuse of discretion. *Heard*, 187 Ill. 2d at 58.

■ Defendant argues that the evidence of other crimes and his gang affiliation lacked probative value and were used only to prejudice the jury. The State contends that defendant's gang affiliation "was introduced to show that defendant would be in that location, because the Gangster Disciples territory included the site of the murder." However, time and place proximity, without more, is an insufficient basis for admission of other crimes evidence. *People v. Charles*, 238 Ill. App. 3d 752, 762, 606 N.E.2d 603 (1992).

The State argues that the gang affiliation is relevant in that the location of the crime was within the territory of defendant's gang and explained his presence in the area. Evidence indicating that defendant was a gang member or involved in gang-related activity is generally held to be admissible to show common purpose or design or to provide a motive for an otherwise inexplicable act. *People v. Patterson*, 154 Ill. 2d 414, 458, 610 N.E.2d 16 (1992). Such evidence, however, is only admissible where there is sufficient proof that the membership or activity is related to the crime charged. *Patterson*, 154 Ill. 2d at 458. In the instant case, there is no indication that defendant's membership was related to this crime. Since the trial court advised the jury of the limited purpose for which the evidence was presented prior to the testimony, in our view, the defendant's other crimes evidence was properly admitted.

We do not condone the detailed questioning by the State identifying the defendant with gang and drug activity in the area and recommend that the State refrain from emphasizing gang and drug activity of defendants in cases where defendants are not charged with gang-related or drug-related offenses. While we consider some of the detailed questioning in the instant case to be unnecessary and improper, we also consider the error to be harmless in view of the substantial weight of the fingerprint and other relevant evidence against the defendant.

While there is widespread prejudice against street gangs, the erroneous admission of gang evidence at trial does not automatically warrant reversal. *People v. Martin*, 271 Ill. App. 3d 346, 355, 648 N.E.2d 992 (1995). A reviewing court may hold such an error to be harmless when it is satisfied that the error did not contribute to the defendant's conviction. *People v. Easley*, 148 Ill. 2d 281, 330, 592 N.E.2d 1036, 1058 (1992). We so hold.

## III

■ Defendant also contends that the trial court denied him a fair trial by precluding the defense from cross-examining Ms. Frazier about her psychiatric history. Prior to the crime and the trial, Ms. Frazier had been hospitalized for five days for a suicide attempt and depression.

"It may be broadly stated that in determining credibility of a witness or the weight to be accorded to his testimony, regard is generally given to his mental condition. Almost any emotional or mental defect may materially affect the accuracy of the testimony." *People v. Phipps*, 98 Ill. App. 3d 413, 416, 424 N.E.2d 727 (1981). Several courts have confirmed that the mental health history of a witness is relevant as it relates to his or her credibility and is thus a permissible area of impeachment. See *People v. Dace*, 114 Ill. App. 3d 908, 913, 449 N.E.2d 1031 (1983); *People v. Helton*, 153 Ill. App. 3d 726, 733, 506 N.E.2d 307 (1987); *People v. Faulkner*, 186 Ill. App. 3d 1013, 1028, 542 N.E.2d 1190 (1989).

While mental health history is relevant as it relates to credibility, and is thus a permissible area of impeachment, before such evidence may be introduced, its relevance must be established. *People v. Williams*, 147 Ill. 2d 173, 237, 588 N.E.2d 983 (1991), citing *People v. Lindsey*, 73 Ill. App. 3d 436, 447-48, 392 N.E.2d 278 (1979); *People v. Walton*, 107 Ill. App. 3d 698, 703, 437 N.E.2d 1273 (1982). The burden is on the party seeking to introduce the evidence to establish its relevance to the witness's credibility. *Helton*, 153 Ill. App. 3d at 733. The trial court in the instant case limited the cross-examination of Ms. Frazier, reasoning that the defendant failed to demonstrate the relevancy of such questioning.

Defendant relies on *People v. Dace*, 114 Ill. App. 3d 908, 449 N.E.2d 1031 (1983). In *Dace*, the State's chief witness had been involuntarily committed to a mental health center less than two years before the offenses occurred. *Dace*, 114 Ill. App. 3d at 915. In an *in camera* conference, the trial court reviewed her case files. The trial court ruled the records were privileged, too old to be relevant, and barred the defendant from questioning the witness concerning her mental history. *Dace*, 114 Ill. App. 3d at 912. The appellate court noted that her testimony was the only evidence of the defendant's participation in the burglary. *Dace*, 114 Ill. App. 3d at 915-16. The appellate court held that, "[c]onfronted with articulable evidence that raises a reasonable inquiry of a witness's mental health history, a court should permit a defendant to discover that history." *Dace*, 114 Ill. App. 3d at 915. The court explained that "[a] thorough examination of a witness's credibility is especially important when that testimony will be determina-

tive of the defendant's guilt or innocence." *Dace*, 114 Ill. App. 3d at 913. Unlike the testimony of the witness in *Dace*, Frazier's testimony was not the only evidence against defendant in the instant case.

Furthermore, appellate courts have noted their discomfort in allowing disclosure of psychiatric records. See *Laurent v. Brelji*, 74 Ill. App. 3d 214, 217, 392 N.E.2d 929 (1979) ("To casually allow public disclosure of [psychotherapeutic treatment] would desecrate any notion of an individual's right to privacy"); *People v. Phipps*, 98 Ill. App. 3d 413, 417, 424 N.E.2d 727 (1981) ("It is commonly recognized that the purpose behind a psychotherapist-patient privilege is to induce the patient to make full disclosure so that proper treatment may be given and to prevent public disclosure of socially stigmatized diseases").

An instructive case is *Goldberg v. Davis*, 215 Ill. App. 3d 930, 575 N.E.2d 1273 (1991). In that case, a psychiatrist filed action to compel production of a patient's prior treatment records for purposes of an administrative disciplinary hearing. The court held that the prior records were not necessary to challenge the patient's credibility or the validity of the charges against the doctor. *Goldberg*, 215 Ill. App. 3d at 950. The court explained that the validity of the charges could be determined through other questioning and that the patient had not raised her mental condition as an issue by appearing as a witness. *Goldberg*, 215 Ill. App. 3d at 950. Moreover, the court held that "[h]er credibility is not dependent on her entire prior mental history." *Goldberg*, 215 Ill. App. 3d at 950..

Another instructive case is *People v. Walton*, 107 Ill. App. 3d 698, 437 N.E.2d 1273 (1982). In *Walton*, the court held that the defendant did not sufficiently show the relevance of the witness's mental health history. *Walton*, 107 Ill. App. 3d at 703. The court reiterated the necessity of establishing the pertinence of a witness' psychiatric history to the credibility of his or her testimony before such evidence may be introduced. 107 Ill. App. 3d at 703.

Here, the trial court relied on *People v. Helton*, 153 Ill. App. 3d 726, 506 N.E.2d 307 (1987), to limit cross-examination of Frazier. The State now relies on *Helton* to support its contention. In *Helton*, the prosecution's witness was hospitalized for depression. *Helton* held that the defendant had not sufficiently demonstrated the relevancy of inquiring as to her mental health history. *Helton*, 153 Ill. App. 3d at 733. The court stated:

> "We also fail to perceive how the mere fact of the victim's hospitalization for severe depression in 1983 would impeach her credibility or affect her ability to communicate her observations of the 1985 attack accurately and truthfully. We therefore find the trial court properly excluded this evidence." *Helton*, 153 Ill. App. 3d at 734.

Similarly, in the instant case, defendant has failed to show how Ms. Frazier's voluntary hospitalization for depression in 1990 would affect her ability to communicate her observations of the conversations she overheard or the conversations that she had with defendant in 1991. Thus, the trial court properly limited cross-examination on this issue.

For the foregoing reasons, the decision of the trial court is affirmed.

Affirmed.

CAHILL, P.J., and McBRIDE, J., concur.