NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 200068-U

NO. 4-20-0068

IN THE APPELLATE COURT

FILED
October 23, 2020
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| TRACEY JANES, | ) | No. 17CF1675 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Erick F. Hubbard, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Knecht and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The trial court did not abuse its discretion by denying defendant's motion for the production of the victim's mental health records.

(2) The trial court did not abuse its discretion by denying defendant's motion for a mistrial based on the violation of a court order excluding certain evidence.

(3) The evidence presented was sufficient to establish defendant's guilt of each charged offense.

(4) Defendant failed to establish his trial counsel provided ineffective assistance.

(5) The trial court did not abuse its discretion when sentencing defendant.

¶ 2    Following a jury trial, defendant, Tracey Janes, was convicted of multiple sex offenses against his minor stepdaughter, B.A. (born July 14, 2002), and the trial court sentenced him to an aggregate term of 74 years in prison. Defendant appeals, arguing (1) the court erred by

denying his motion to obtain B.A.'s mental health records, (2) the court erred by denying his motion for mistrial based on the violation of a court order that barred evidence related to B.A.'s mental health, (3) the evidence was insufficient to establish his guilt beyond a reasonable doubt, (4) his trial counsel was ineffective, and (5) the sentence imposed by the court was excessive and an abuse of its discretion. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4                              A. Pretrial Proceedings

¶ 5        In November 2017, the State charged defendant with multiple sex offenses based on allegations that he engaged in various sexual acts with B.A. when she was 9 to 13 years of age. Specifically, it charged defendant with (1) three counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)) (counts I through III), alleging that between July 14, 2011, and July 13, 2015, when B.A. was under 13 years old, defendant, who was over the age of 17, committed acts of sexual penetration with B.A. by placing his finger, tongue, and penis in her vagina; (2) three counts of criminal sexual assault (*id.* § 11-1.20(a)(3)) (counts IV through VI), alleging that between July 14, 2015, and September 1, 2015, when B.A. was under the age of 18, defendant, who was B.A.'s family member, committed acts of sexual penetration with B.A. by placing his finger, tongue, and penis in her vagina; and (3) 14 counts of aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(i), (d)) (counts VII through XX) alleging that between July 14, 2011, and July 13, 2015, when B.A. was under 13 years old, and between July 14, 2015, and September 1, 2015, when B.A. was at least 13 but less than 17 years old, defendant, who was over the age of 17 and more than five years older than B.A., committed acts of sexual conduct with B.A. by placing his hand and penis on her vagina, his hand on her breast, his penis on her face, her hand on his penis, and "transmitt[ing] or transferr[ing] his semen" onto her face and stomach.

- 2 -

¶ 6        Prior to trial, both parties filed several motions. Relevant to this appeal, in May 2018, defendant filed a "Motion for Production" of B.A.'s mental health records. He alleged that he "ha[d] become aware" that B.A. was the subject of a "psychiatric admission," "under psychiatric care," and, thus, suffering "from a mental health condition." Defendant maintained that B.A.'s mental health records could be relevant to the issue of her competency to testify, credibility, and reliability. He asked that the court order the State to produce B.A.'s mental health records "from January 1, 2017 to the present date." The same month, defendant filed a motion *in limine* to exclude B.A.'s testimony on the basis that she "may be incompetent to testify as a witness" due to her reported "psychiatric admission" and "psychiatric/mental health condition." He asked the court to conduct a pretrial hearing to determine B.A.'s competency to testify at trial and enter an order excluding her testimony in the event the court found her incompetent.

¶ 7        In November 2018, the trial court conducted a hearing on pending motions in the case. As to defendant's motion for the production of B.A.'s mental health records, defendant's counsel argued that it was his understanding that B.A. had been the subject of "a psychiatric admission," which raised a question as to whether she was competent to testify. He requested that the court "conduct some inquiry of [B.A.] to determine" her competency. He also asked that if defendant was not permitted access to B.A.'s mental health records, that "at least the [c]ourt should review them." In response, the State asserted that it did not possess any of B.A.'s mental health records and, therefore, had no obligation to produce those records. It also argued that the records were irrelevant, representing to the court that, to the State' knowledge, B.A. had "anxiety and maybe depression" and noting the absence of any specific allegations by defendant that B.A. was psychotic, had hallucinations, or had schizophrenia. Ultimately, the court denied the motion, stating as follows:

"Show the motion for production of mental health records is denied. And, [defense counsel], I think this is absolutely a fishing expedition. I don't know of any allegation that the victim's mental health issues are at issue. Meaning that she was somehow delusional or schizophrenic or paranoid or some other psychotic condition where she's therefore making these things up. *** I don't know of any basis to order them at this time. I don't think they are relevant."

¶ 8        At the hearing, the trial court also considered defendant's motion *in limine* to exclude B.A.'s testimony. In presenting argument on the motion to the court, defense counsel argued B.A.'s recent psychiatric admission was sufficient cause for the court to conduct a hearing to determine her competency. The State objected, arguing witnesses are presumed competent and that defendant had produced nothing to indicate otherwise as to B.A. Again, the court denied defendant's motion.

¶ 9                              B. Jury Trial

¶ 10        In June 2019, defendant's jury trial was conducted. During opening statements, defense counsel made two references to B.A. "cutting herself." The State objected after the first reference and its objection was sustained. After the second reference, the parties engaged in a sidebar with the trial court, which was not transcribed.

¶ 11        At trial, the State's evidence showed B.A. was born on July 14, 2002. At the time of trial, she was 16 years old, residing with her biological father, and "going into [her] junior year" of high school. B.A. had three younger siblings with whom she shared the same mother—a sister who was age 13 and two brothers, ages 10 and 5. Defendant, who was born on July 16, 1975, was B.A.'s stepfather and the father of her two younger brothers.

¶ 12        In November 2006, when B.A. was four years old, her mother, Tabatha Janes,

began dating defendant. In February 2007, Tabatha, B.A., and B.A.'s younger sister began living with defendant at 515 Shonna Drive in Mt. Zion, Illinois, *i.e.*, the "old" house. In March 2008, defendant and Tabatha were married. In July 2014, after B.A. turned 12 and just prior to when she entered the sixth grade, the family moved to a "new" house located at 805 Mintler Drive, where Tabatha continued to reside.

¶ 13    B.A. testified that when she first met defendant, she thought he was "really nice." However, around the time defendant and Tabatha were married, defendant's "attitude changed" and he began to do things that made B.A. uncomfortable. Specifically, B.A. testified that when her mother would go to the gym, defendant would touch her. Also, in either the garage or in defendant and Tabatha's bedroom, defendant showed B.A. pornography on his computer. At the "old" house on Shonna Drive, defendant would touch B.A. both outside and underneath her clothing "in [her] mom's room." B.A. stated defendant began by rubbing her back and then "[i]n between" her thighs. He also rubbed the outside of B.A.'s vagina under her clothes. B.A. did not recall how many times that happened but stated it was more than 10. The following colloquy then occurred between the prosecutor and B.A.:

"Q. Okay. Do you remember—do you remember being interviewed back in October—I think October 25th of 2017 at the Child Advocacy Center?

A. Yes.

Q. And at that time did you think that this started when you were in third grade?

A. Yes.

Q. Why is that?

A. 'Cause I remember him showing me the porn, and it's just something I

- 5 -

remember going to school thinking about."

¶ 14    B.A. further recalled that at the "old" house, defendant would grab her breasts or her buttocks when he would walk by her. She stated he would "just do a quick little pinch or poke." B.A. told defendant to stop and spoke to Tabatha about what occurred; however, both Tabatha and defendant responded that defendant "was playing."

¶ 15    According to B.A., after moving to the "new" house, the "things [defendant] did" to her changed and he "did more." She testified that when her family first moved into the new house, they had only a mattress and a television in the downstairs living room. She recalled watching a movie in that room with defendant, her mother, and siblings. B.A. testified she fell asleep and when she woke up, only defendant was present. He was laying behind B.A. on the mattress. B.A. stated defendant was rubbing her legs and her vagina on the outside of her clothes. Defendant then "started going on the inside of [her] pants." B.A. testified defendant put his hands underneath her underwear and was rubbing both the inside and the outside of her vagina. She specified that defendant's fingers touched the inside of her vagina and that was the first time he had done so. B.A. clarified that the incident occurred the same summer her family moved into the "new" house. She recalled that she turned 12 that summer but did not know if the incident occurred before or after her twelfth birthday.

¶ 16    B.A. testified defendant continued to do "things" to her while she was in sixth grade. She stated she would be lying on the couch and defendant "would take [her] pants off and do the same thing as the first time." B.A. recalled that her underwear would also be off, and defendant would lie behind her and rub her vagina on the inside and outside. She testified defendant would also "move and get in front of [her]" and "try to get [her] to touch his penis." B.A. stated her hand would be closed and defendant "would try to open up [her] fingers to wrap

[her] hand around his penis." Defendant would state: " 'Come on. Just do it.' " B.A. testified defendant was able to make her touch his penis and that he "put [her] hand on him, and *** made [her] hand move up and down." Defendant was able to get B.A. to touch his penis more than one time. When that occurred, defendant would sometimes be touching B.A.'s breasts or her vagina.

¶ 17 B.A. testified there were times defendant would also "move his head in between [her] legs" with his mouth touching her vagina. She stated defendant's tongue touched on both the inside and the outside of her vagina. Sometimes, defendant would also touch himself. On those occasions, B.A. would be lying on her back on the couch. Defendant would take her pants off and push her top up. He would then touch her vagina with his hand and move his other hand up and down on his penis. B.A. testified that sometimes defendant would ejaculate on her stomach or her face. She recalled that defendant used his hands to "[r]ub it in" after ejaculating on her stomach. Further, he would put his semen on his finger and then put his finger in B.A.'s mouth.

¶ 18 B.A. further recalled that defendant attempted to put his penis in her mouth. She stated he would try to open her mouth with his hand while his penis was by her mouth and touching her face. B.A. stated there was a time defendant did put his penis in her mouth. She acknowledged that she had not previously shared that detail, stating she did not want anyone to know.

¶ 19 B.A. testified that when defendant would touch her breasts at the "new" house, he would use both his hands and his penis. He also used his penis to touch B.A.'s vagina. B.A. testified she would be lying on her back on the couch with her pants off and defendant, whose pants were also off, would rub his erect penis against her vagina and between her labia.

¶ 20 B.A. stated that all the sexual acts she described occurred more than once. She could not say with certainty exactly how many times the acts happened because they "happened so many times." B.A. remembered that things began happening in third grade and continued throughout

fourth, fifth, and sixth grades. While she was in sixth grade, it seemed like the acts happened "[e]very night." B.A. testified that "[a]round the summer before seventh grade," the summer she turned 13, she realized that what defendant had been doing to her was wrong. According to B.A. "in the beginning of seventh grade," she started staying in her bedroom, locking her bedroom door, "and not really being a part of the family." She agreed that "sometime during that summer" was the last time defendant touched her and that "[h]e didn't do anything [when she was] in seventh grade." When asked how she remembered that the abuse "stopped and it didn't happen in seventh grade," B.A. testified: "Because that's when I became angry and stopped coming out of my room."

¶ 21　　　　Additionally, B.A. testified regarding disclosures about the abuse that she made to others. She explained that at the "new" house, she was grounded and her phone was taken away. Tabatha then saw a message on B.A.'s phone that B.A. sent to a friend regarding defendant. Both Tabatha and defendant's mother, Nancy Janes, then questioned B.A. about the message. B.A. testified she "did not admit to it at first" but after they continued to question her, she "told them a little bit *** but not the full thing." B.A. stated that although it felt "[g]ood" testifying about the abuse, she previously was scared to talk about it and "felt like it was [her] fault." Additionally, she did not tell everything that happened because she "didn't really want [Tabatha and Nancy] to know." B.A. stated she felt scared and "like [she] was going to get in trouble." After disclosing "a little bit" of what occurred with defendant to Tabatha and Nancy, nothing happened, and defendant remained living in B.A.'s house.

¶ 22　　　　In approximately October 2017, when B.A. was a freshman in high school, she spoke with Tabatha again about defendant. She reported that defendant had touched her and gave Tabatha more information. Tabatha then called defendant at work and he returned home. B.A. testified Tabatha questioned defendant in front of B.A. and while Nancy was also present.

Although defendant initially denied touching B.A., he ultimately admitted what he had done, apologized to B.A., and then left with Nancy. B.A. also described an incident when defendant's father showed up at her home. B.A. testified he yelled, screamed, asked questions, "and then he fell on the floor." B.A. testified she felt upset and scared, "like everything was [her] fault."

¶ 23        Following B.A.'s direct examination, the trial court and the parties conferred outside of the jury's presence and revisited the issue raised in the sidebar that occurred during opening statements. Relative to that earlier discussion, the State requested "some parameters" regarding defendant's cross-examination of B.A., arguing the issue of B.A.'s "cutting" and her psychiatric hospitalization was not relevant and asking that defense counsel "be told specifically he cannot ask questions about those things." Defense counsel asserted that it was not his "intention to go into [B.A.'s] psychiatric admission or her psychiatric conditions." However, he believed the issue of "cutting" was relevant to conversations B.A. had with Tabatha and Nancy. Ultimately, the court ruled that there would "be no mention of any kind of psychiatric treatment or records" and that the issue of B.A. "cutting" was also not relevant.

¶ 24        On cross-examination, B.A. again acknowledged that she had not previously disclosed that defendant put his penis in her mouth, including "back in 2017" when she was interviewed at the Child Advocacy Center and spoke to someone from the Department of Children and Family Services (DCFS). B.A. further testified that in the summer of 2015, *i.e.*, the summer she turned 13 and before she began seventh grade, she had a discussion with Tabatha regarding problems with her behavior. Tabatha called Nancy to come over and, at some point, B.A. spoke with Nancy in her bedroom. B.A. did not remember if, at that time, she told Nancy she had been sexually abused by defendant. She agreed that she and Nancy "had a pretty good relationship" and, sometimes, when her mother was not available, Nancy would take her to appointments or pick her

up from school. When asked whether she and Nancy "had a pretty close relationship," B.A. responded: "I guess." B.A. then recalled that in the fall of 2015, she had another conversation with Tabatha and Nancy. She testified she spoke with Nancy in her bedroom and remembered "that's when [she] told Nancy" about "some of what happened" with defendant. Nancy, however, did not believe B.A. and responded that "her son would never do that to [B.A.]."

¶ 25 On further cross-examination, B.A. acknowledged that she did not report defendant's sexual abuse to her father or any school personnel. Also, she could not recall particular dates that the abuse occurred but agreed "that after the summer of 2015 nothing happened again."

¶ 26 On redirect examination, B.A. testified that at the "old" Shonna Drive house, in addition to placing his hand under her clothes and on her vagina, defendant also placed his fingers inside her vagina. Further, regarding her relationship with Nancy, the following colloquy occurred between the prosecutor and B.A.:

"Q. Okay. [Defense counsel] asked you about your relationship with Nancy, and he said you had a good relationship with Nancy. You said yes. He said you had a close relationship with Nancy, and you kind of thought about it and said, 'I guess.' Why did you say that?

A. We weren't really close."

¶ 27 On redirect examination, B.A. also agreed that "the beginning of seventh grade, which [was] the fall of 2015 [was] when [she] start[ed] staying in [her] room by [her]self and locking the door." She asserted "no other sexual abuse happen[ed] after that point." Additionally, she remembered that the "first time" she told Tabatha and Nancy about the abuse was during seventh grade because she remembered "going to school crying." Finally, she maintained that she testified that defendant placed his penis in her mouth because "today is the day I get everything

out."

¶ 28     The State also presented evidence that the police extracted information from the cell phones of both defendant and Tabatha, including text message exchanges between defendant, Tabatha, and Nancy. Printouts of those exchanges were admitted into evidence over defendant's objection. With respect to text messages extracted from defendant's cell phone, the State's evidence showed that on October 23, 2017, following B.A.'s disclosures and the involvement of legal authorities, Nancy sent text messages to defendant suggesting that he "check *** into the hospital" and asking: "How do you see this going?" Defendant's response, which had been deleted from his phone, was that he would "go to jail for many years." During the exchange, defendant also sent Nancy a text stating: "Was never that she was young." That text had also been deleted from his phone.

¶ 29     Tabatha testified that the first time she recalled B.A. reporting "something to [her] about *** defendant doing something inappropriate" was in March 2016, when B.A. was in seventh grade. According to Tabatha, B.A. got in trouble at school and, as a result, Tabatha confiscated B.A.'s phone. Tabatha stated she saw a message B.A. sent to her best friend, which caused Tabatha to contact Nancy and have a discussion with B.A. Initially, B.A. would not speak to Tabatha but, later, reported that defendant "had groped her." Tabatha confronted defendant, who "denied it" but apologized if he had "touched [B.A.] inappropriately while playing with her."

¶ 30     Tabatha stated she also had a conversation with B.A. about defendant on October 18, 2017. She testified B.A. reported "she was ready to talk." According to Tabatha, B.A. told her "everything that had happened" but stated "that it only happened twice at that point, [or] a few times." Ultimately, Tabatha confronted defendant, who "denied it again." Defendant and Tabatha then spoke with B.A. in her bedroom. Tabatha testified she asked defendant "a bunch of

- 11 -

questions." Defendant "just stared at [Tabatha] with a straight face" while B.A. was crying. After approximately 10 to 15 minutes, defendant admitted "he did it." Tabatha testified as follows:

"A. I just asked him if he touched [B.A.] inappropriately.

Q. And what did he say?

A. He said 'yes.'

Q. What else did he say?

A. He said that it was not her fault, and that he wished he could take it back if he could.

Q. Did he apologize to her in the bedroom?

A. He did."

¶ 31       Tabatha testified that once defendant admitted what he had done, she called Nancy, who lived two to three blocks away, and asked her to come over. Once Nancy arrived, there was another conversation in B.A.'s room with Nancy present. Tabatha explained that defendant "finally admitted to [Nancy] what he did." Nancy told Tabatha she could not call the police because "it would ruin their reputation." Ultimately, Tabatha informed defendant that they "were done" and he had to "pack his bags" and leave the house. Defendant told Tabatha it was not "[B.A.'s] fault and he was sorry." After Nancy and defendant left, defendant's father, Randy Janes, "busted open" Tabatha's door and was screaming and yelling. According to Tabatha, Randy then "fell flat on [the] living room floor," prompting her to call 911. As a result of Randy's outburst, B.A. "was freaking out."

¶ 32       Tabatha testified that after B.A.'s disclosures on October 18, 2017, defendant moved out of their home. Although Tabatha did not alert either the police or DCFS about B.A.'s disclosures, on October 23, 2017, DCFS personnel "showed up at [her] door." After they left,

- 12 -

Tabatha contacted defendant.

¶ 33    Tabatha also testified regarding her text exchanges with defendant. She testified that she received a text message from defendant on October 21, 2017, which stated, "You at least plan on not telling your dad, I hope." According to Tabatha, defendant did not want her to tell her father what defendant had done to B.A. Tabatha stated she responded that she would definitely not tell her father and defendant replied, "Thank God." Tabatha then texted that her father "would kill" defendant and defendant replied, "Right."

¶ 34    On October 23, 2017, Tabatha texted defendant that DCFS was at her house and that "[s]omebody reported." Defendant responded, "WTF." After further messages between the two, Tabatha informed defendant that a police report about defendant was "happening now." Defendant responded with expletives and texted, "IDK if I should kill myself or go." Tabatha continued to testify regarding the text message exchange between herself and defendant and read a text she sent to defendant stating as follows: "[B.A.] thinks it's all her fault. I'm up all night because she said she was going to kill herself after your dad left. We almost had to take her to the hospital."

¶ 35    In further texts between Tabatha and defendant, defendant questioned what occurred with the DCFS caseworker, stated he was "doped up on Benadryl," and informed Tabatha that he did not "expect to be lied for." Tabatha repeatedly questioned where defendant was and asked if he intended to hurt himself. Defendant responded that he was "so lost and confused" and that he did not "want to, but the other option [was not] good either." Defendant informed Tabatha that he had "lots of pills," a knife, and a rope. He stated he was "[n]ot clear where [he was] headed" and had "been thinking where would be the least bad place to get discovered." Defendant apologized to Tabatha, asked her to "tell the kids [he] love[d] them," and stated, "[t]ell [B.A.] it's

- 13 -

not her fault." He also asked Tabatha "[w]hat level of bad" B.A.'s father knew about, stated he did not know if he could "accept" jail, and asserted that "[o]ne too many found out somehow." After Tabatha asked defendant "[w]hy did you do it," defendant responded that it was his fault, he had hidden his depression, that Tabatha had been "right about the sex addiction," and "[i]t was never about her being young."

¶ 36 Following Tabatha's testimony on direct examination, defendant's counsel asked to be heard outside the jury's presence and the trial court called for a recess in the proceedings. Defense counsel then moved for a mistrial on the basis that the jury had been tainted by references in the text message exchange between defendant and Tabatha to (1) defendant's psychological condition and suicidal remarks and (2) B.A. "trying to kill herself." Counsel argued the latter reference, although it appeared inadvertent, flouted the court's earlier ruling that prohibited defendant from "getting into" B.A.'s psychological issues and improperly elicited sympathy from the jury.

¶ 37 The State responded, arguing it had "been very clear" that it intended to introduce the text message correspondence as evidence and that defendant's suicidal remarks went to his "consciousness of guilt" rather than anything about his mental health. Regarding the reference to B.A., the State asserted there had been a single text message where Tabatha was explaining what was "going on the night this happens." It argued the reference had nothing to do with sympathy or B.A.'s mental health but, instead, to explain what was going on, how B.A.'s disclosures were handled, and why B.A. had "not been comfortable talking about it."

¶ 38 The trial court denied defendant's motion for a mistrial. First, it agreed with the State that defendant's suicidal comments went to consciousness of his guilt. Second, the court found that although the reference to B.A. and suicide was "a little unexpected *** in light of the

- 14 -

motion *in limine*," it was not intentional, amounted to a "limited reference" that did not "squarely" violate its previous order, and did not rise to the level of warranting a mistrial. Nevertheless, the court asked for the parties "thoughts on whether or not [an instruction to the jury] would be appropriate." The State deferred to defense counsel, who indicated he had "mixed feelings" because an instruction "could highlight the issue." The court asserted it was inclined to allow an instruction but would "leave that to [defense counsel's] discretion." Defense counsel elected to "consider whether to tender a written instruction during the instruction conference."

¶ 39        On cross-examination, Tabatha testified that when defendant admitted to her that he touched B.A. inappropriately, they did not "go into full details." Further, she asserted that it was during the March 2016 conversation that B.A. reported defendant had "groped" her on her breasts and buttocks. Then, when Tabatha questioned defendant about what B.A. had said, defendant stated he was only "playing around." Additionally, Tabatha denied that in October 2017, B.A. specified that the abuse occurred only two times, stating as follows: "I just asked her if it happened more than once. She said yes. I asked her if it happened more than twice, she said yes." She asserted that B.A. told her "it happened at Shonna Drive and Mintler Drive and it was over a four-year period." Although Tabatha remembered being interviewed by the police in October 2017, she denied reporting to the officer who interviewed her that B.A. initially told her the abuse only happened twice at the Mintler Drive residence. Finally, Tabatha denied that Nancy and B.A. had a close-knit relationship and agreed that B.A.'s relationship with defendant appeared "normal" up to October 2017.

¶ 40        Finally, the State's evidence also showed that in the early morning hours of October 24, 2017, the police located defendant in his vehicle parked behind "some storage units" in Wapella, Illinois. An unopened package of knives and a rope were found inside the vehicle.

¶ 41        At the conclusion of the State's evidence, defendant moved for a directed verdict on all counts except counts IV, V, and VI, arguing the State failed to establish the timing of the alleged sexual acts with respect to the remaining charges and whether they occurred before or after B.A. turned 13. The trial court denied defendant's motion.

¶ 42        As part of his case, defendant first presented the testimony of Craig Reed, a police officer for the City of Mt. Zion. Reed testified that on October 26, 2017, he interviewed Tabatha and on November 13, 2017, wrote a report, documenting the interview. He agreed that his report contained the following description of Tabatha's statements during the interview: " 'Tabatha stated [B.A.] told her that these things happened at the house on Shonna Drive as well. Tabatha stated [B.A.] told her initially it only happened twice, and it was at the house on Mintler Drive.' " He further testified that the information contained in his report was what Tabatha had stated to him during her interview.

¶ 43        Defendant also presented the testimony of his parents, Nancy and Randy. Nancy testified she was "very close" with Tabatha and the two talked every day. She asserted she was also close with B.A., noting she took B.A. to appointments and shopping for her birthday. According to Nancy, she and B.A. were alone together often. She recalled an occasion in 2015 or 2016 when Tabatha asked her to come over and she had a conversation with both Tabatha and B.A. Nancy then had a conversation with B.A. alone in B.A.'s bedroom. She denied that during that conversation there was "anything mentioned about any sexual misconduct." Nancy further testified that she visited defendant and Tabatha's home up to October 2017. She denied noticing occasions when B.A. would stay in her room or avoid defendant, stating that B.A. "could sit anywhere she wanted" and "she would sit right *** by [defendant]." On cross-examination, Nancy testified that defendant was her oldest son, that she loved him very much, and she did not want to

see him get in trouble. Defense counsel did not conduct any redirect examination of Nancy.

¶ 44 Randy also testified he visited Tabatha and defendant's home numerous times prior to October 2017. He stated that every time he visited their home, B.A. would sit on the couch "right beside" defendant. According to Randy, defendant and B.A. acted more like defendant was B.A.'s father than her stepfather.

¶ 45 Randy acknowledged going to defendant and Tabatha's house in October 2017 and that he had been "very upset" and "ranting." While there, he experienced chest pains and "went to the floor." On cross-examination, Randy agreed B.A. was present in the home at the time he was "ranting." He also testified that defendant was his oldest son and he did not want to see defendant get in any trouble. Again, defense counsel did not conduct any further examination of the witness.

¶ 46 At the jury instruction conference, defense counsel asserted he had given more thought to the issue of a cautionary instruction based on the reference in text messages to B.A. and suicide. He elected not to offer any such instruction, asserting, "I don't believe that we can do so without making the matter worse by drawing the jury's attention to it again." Counsel then renewed his motion for a mistrial, which the trial court denied.

¶ 47 Ultimately, the jury found defendant guilty of each of the 20 charged offenses.

¶ 48 C. Posttrial Motions and Sentencing

¶ 49 In June 2019, shortly following his jury trial, defendant filed a posttrial motion to vacate the judgments of conviction against him or, alternatively, for a new trial. Relevant to this appeal, he argued (1) the State's evidence was insufficient to establish his guilt of all but counts IV, V, and VI because those counts required proof that B.A. was under the age of 18 when the alleged sexual acts were committed and "[t]he other counts required more specific proof of [B.A.'s] age *** at the time of each alleged offense"; (2) the trial court erred by denying his motion

- 17 -

for a mistrial "based upon the State introducing evidence *** regarding the threat to commit suicide by B.A."; and (3) the court erred by denying his pretrial motion for the production of B.A.'s mental health records.

¶ 50    In July 2019, defendant obtained new counsel who entered an appearance on his behalf. His previous attorney, Gary F. Geisler, was granted leave to withdraw from the case. In October 2019, with the aid of his new counsel, defendant filed a supplemental motion for a judgment notwithstanding the verdict or, alternatively, a new trial. Relevant to this appeal, he argued Geisler had been ineffective by failing to (1) argue, in connection with defendant's motion for the production of B.A.'s mental health records, that "the mere existence of mental health records affected [B.A.'s] credibility"; (2) seek an instruction advising the jury to ignore the text message referencing B.A. and suicide; and (3) conduct redirect examination of defendant's parents to elicit testimony that they would not lie or misrepresent the truth for defendant after they testified on cross-examination by the State that they loved defendant and did not want to see anything bad happen to him.

¶ 51    On October 8, 2019, the trial court conducted a hearing at which it considered and denied defendant's posttrial motions. It then proceeded with his sentencing.

¶ 52    Information before the trial court at sentencing included victim impact statements from B.A. and her parents, detailing the impact of defendant's actions on B.A., and defendant's presentence investigation (PSI) report. According to the report, defendant was 44 years old and his only prior criminal conviction was for the misdemeanor offense of operating a watercraft while under the influence of alcohol. He reported having a close relationship with his parents and three siblings and that he had two sons, ages 10 and 5. The report further showed that defendant was a high school graduate and, at the time of his arrest, had worked for the same employer for 10 years.

He asserted he was in good physical health and denied any problems with drugs or alcohol. The report showed, however, that defendant had been hospitalized prior to his arrest for attempting suicide and that he suffered from bouts of depression since that time.

¶ 53          As evidence in aggravation, the State presented the testimony of Lieutenant Michael Foster with the Mt. Zion Police Department. Foster testified he assisted in the investigation into B.A.'s allegations against defendant. During the initial investigation, B.A.'s younger sister, M.A., was interviewed but did not disclose any abuse. However, in July 2019, the police were informed that M.A. made disclosures about defendant in a letter to Tabatha. She was then reinterviewed. According to Foster, M.A. reported that defendant touched her buttocks and "tried to go further" but M.A. stopped him. She asserted defendant would also try to pull her pants down and be alone with her. M.A. further disclosed that defendant got into a hot tub with her while naked and tried to remove her swimsuit, walked into her room naked, and stole her bras. Finally, according to M.A., defendant requested she not tell anyone about those occurrences.

¶ 54          In mitigation, defendant presented a group exhibit with several letters written by friends and family members on his behalf. He also submitted a "report" indicating that with counseling he would be considered a low risk for reoffending.

¶ 55          In presenting its argument to the trial court, the State noted that defendant faced a total sentence in the range of 33 to 120 years in prison and asked the court to impose an aggregate sentence of 105 years. It argued a significant sentence was necessary given the seriousness of the offenses, the lack of applicable mitigating factors, and the need for deterrence. Defendant's counsel asked that the court impose the minimum aggregate sentence allowable. He argued defendant's conduct did not cause or threaten serious physical harm, defendant was willing to "make his victim whole as far as any counseling," defendant had no significant prior criminal

history, the circumstances were unlikely to reoccur with counseling, and imprisonment would entail an excessive hardship on defendant's dependents. Finally, defendant gave a statement in allocution. He asserted he felt "great sorrow" for B.A. and her siblings and "great pain for the entire family." He then discussed his love for his sons and his relationship with them. Additionally, defendant maintained that he was "dedicated to improving" himself, participated in Bible studies, and was willing to engage in any counseling that was available to him.

¶ 56          As stated, the trial court sentenced defendant to an aggregate term of 74 years in prison—15 years on counts I, II, and III; 8 years on counts IV, V, and VI; and 5 years on each of the remaining 14 counts. The court noted counts I through VII were to be served consecutively to one another while counts VIII through XX were to be served concurrently with count VII. In setting forth its ruling, the court stated it found the applicable factors in aggravation included that the offenses caused or threatened serious harm, both physical and emotional; the need for deterrence; and that defendant held a position of trust over B.A. Regarding factors in mitigation, the court stated that it did find defendant had no history of prior delinquency and, prior to the offenses at issue, had led a law-abiding life. It found no other statutory mitigating factors were applicable.

¶ 57          On October 31, 2019, defendant filed a motion to reconsider his sentence. He argued his sentence was excessive and the trial court failed to properly consider or weigh various factors, including several statutory factors in mitigation. Following a hearing in January 2020, the court denied defendant's motion.

¶ 58          This appeal followed.

¶ 59                              II. ANALYSIS

¶ 60          A. Denial of Defendant's Motion for B.A.'s Mental Health Records

¶ 61    On appeal, defendant first argues the trial court abused its discretion by denying his pretrial motion to obtain B.A.'s mental health records. He contends that "the mere existence" of mental health records affects a witness's credibility. Further, defendant maintains B.A.'s credibility was a central issue in the case and that it was undisputed that she sought and received mental health treatment.

¶ 62    "Illinois courts have held that evidence of a witness's mental condition is admissible to the extent that it bears on the credibility of the witness's testimony." *People v. Monk*, 174 Ill. App. 3d 528, 533, 528 N.E.2d 1063, 1066 (1988). Cases from this court have established a two-step procedure for the discovery of mental health records. *Id.* at 534. "First, [the] defendant must sufficiently show that the requested records are material and relevant to the witness's credibility. If that is done, the discovery is permissible. However, if the witness or therapist asserts their statutory privilege, then an *in camera* hearing with counsel present is held on this question." *Id.*

¶ 63    To support his entitlement to the discovery of B.A.'s mental health records, defendant relies on this court's decision in *People v. Phipps*, 98 Ill. App. 3d 413, 424 N.E.2d 727 (1981). There, the defendant was charged with "cruelty to persons," maltreatment of a mentally disabled person, and battery while employed at a residential mental health facility. *Id.* at 414. Prior to trial, the defendant sought access to "personal files" that contained the mental health information of seven State witnesses who were residents of the facility. *Id.* The trial court granted the motion and the State appealed. *Id.*

¶ 64    On review, this court determined the trial court did not abuse its discretion in granting the defendant's motion. *Id.* at 415. We noted that the case involved witnesses who were "residents of a state mental health institution" and stated it took "little conjecture to conclude that

- 21 -

the files could contain information which would be highly probative of the witnesses' truth, veracity, ability to perceive, and memory capabilities." *Id.* As defendant points out, we also stated that "[a]lmost any emotional or mental defect may materially affect the accuracy of the testimony." *Id.* at 416. Further, we concluded that the defendant's constitutional rights of confrontation and due process required the disclosure of relevant mental health records even when a statutory evidentiary privilege against disclosure had been asserted. *Id.* at 417.

¶ 65        However, contrary to defendant's suggestion on appeal, *Phipps* does not hold that the "mere existence" of mental health records necessarily affects a witness's credibility and mandates their disclosure. Further, following *Phipps*, we held the rule set forth therein was not to be deemed "so broad as to negate the necessity of establishing the pertinence of a witness'[s] psychiatric condition or history to the credibility of his or her testimony before such evidence may be introduced or before a witness'[s] otherwise confidential mental health records may be subpoenaed or discovered." *People v. Walton*, 107 Ill. App. 3d 698, 703, 437 N.E.2d 1273, 1277 (1982). In *Walton*, we distinguished *Phipps* on the basis that it involved witnesses who "suffered from psychiatric disorders so severe that they were long-term residents of a mental hospital" and were "institutionalized at both the time of the alleged offenses and the time of the trial." *Id.* Further, we stated as follows:

> "In the case at bar, by contrast, the [victim] had once been a voluntary patient in a
> mental hospital, but apparently had successfully completed his treatment there. He
> was not hospitalized at either the time of [the underlying offense], the time of [the]
> defendant's trial, or during the intervening period. Aside from the victim's
> testimony as to his nervous condition and prior treatment therefor, the only other
> evidence offered in support of [the] defendant's effort to obtain access to the

victim's mental health records was the statement of [the] defendant's counsel, while arguing [the] defendant's motion for discovery of those records, that the victim was 'under medical supervision by the McLean County Center for Human Services.' "

*Id.*

We concluded such evidence fell "short of the type *** necessary to establish the relevancy of the information contained in the victim's mental health records to his credibility as a witness." *Id.* at 704.

¶ 66 Here, although there appears to be no dispute that B.A. received mental health treatment at some point after the commission of the alleged offenses, defendant was required to do more than establish the "mere existence" of her mental health records to be entitled to their discovery. Both before the trial court and on appeal he has failed to make any showing that B.A.'s mental health records were relevant and material to the issue of her credibility. Ultimately, we find this case more similar to the circumstances presented in *Walton* than *Phipps*. Accordingly, the trial court did not abuse its discretion by denying defendant's motion for the production of B.A.'s records.

¶ 67 B. Denial of Defendant's Motion for Mistrial

¶ 68 Defendant next challenges the trial court's denial of his motion for a mistrial based on a reference during Tabatha's testimony to B.A. stating "she was going to kill herself." Defendant argues that because he had been foreclosed from cross-examining B.A. regarding her mental health by order of the court, the later reference to B.A.'s suicidal comments was improper, prejudicial, and denied him his right to a fair trial.

¶ 69 "A trial court has broad discretion to determine the propriety of declaring a mistrial." *People v. Hall*, 194 Ill. 2d 305, 341, 743 N.E.2d 521, 542 (2000). "A mistrial should be

granted where an error of such gravity has occurred that the defendant has been denied fundamental fairness such that continuation of the proceedings would defeat the ends of justice." *People v. Nelson*, 235 Ill. 2d 386, 435, 922 N.E.2d 1056, 1083 (2009). The violation of a court order to exclude certain evidence "will constitute a ground for mistrial only where the violation deprived the defendant of a fair trial." *Hall*, 194 Ill. 2d at 341-42. On review, the court's denial of a motion for mistrial "will not be disturbed *** absent a clear abuse of discretion." *Nelson*, 235 Ill. 2d at 435.

¶ 70        Here, we find defendant was not deprived of his right to a fair trial by the challenged reference. The record shows the trial court barred evidence related to B.A. and "any kind of psychiatric treatment or records." Following that order and during the State's direct examination of Tabatha, a single reference was made to B.A. making a suicidal remark. However, the reference was brief and isolated. At the time it was made, the focus of the State's inquiry was not on B.A.'s psychiatric treatment or any mental health condition, but on comments defendant made to Tabatha after B.A.'s final and more complete disclosures of abuse and the involvement of legal authorities. The record reflects no further reference to B.A.'s mental health history or treatment at trial. Additionally, defendant was given the opportunity to have the jury instructed to disregard the comment. Under these circumstances, we find no clear abuse of discretion in the court's determination that the suicidal statement attributed to B.A. in the text messages neither "squarely" violated its order nor warranted a mistrial.

¶ 71                                C. Sufficiency of the Evidence

¶ 72        On appeal, defendant further argues the State's evidence was insufficient to establish his guilt of each charged offense beyond a reasonable doubt. Specifically, he points out that each of the 20 charges against him specified B.A.'s age and the dates for when the offenses

were alleged to have occurred. Defendant maintains, however, that, at trial, "B.A. was incapable of articulating her age at the time of the alleged offenses." He also argues that B.A. was an incredible witness due to her lack of memory, due to contradictions in her testimony and inconsistencies with other evidence, and because she revealed new information about the alleged abuse for the first time at trial.

¶ 73        "The State has the burden of proving beyond a reasonable doubt each element of an offense." *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876. "When a defendant challenges the sufficiency of the evidence, a reviewing court must determine whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *People v. Harris*, 2018 IL 121932, ¶ 26, 120 N.E.3d 900. "The trier of fact remains responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts." *Id.* On review, we do not retry the defendant and are required to draw all reasonable inferences in favor of the prosecution. *Id.*

¶ 74        Further, "[t]he testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant." *Gray*, 2017 IL 120958, ¶ 36. "A conviction will not be reversed simply because the evidence is contradictory or because the defendant claims that a witness was not credible." *Id.* Instead, reversal is only warranted where "the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.* ¶ 35.

¶ 75        Here, the State charged defendant with multiple sex offenses, including 3 counts of predatory criminal sexual assault of a child (counts I through III), 3 counts of criminal sexual assault (counts IV through VI), and 14 counts of aggravated criminal sexual abuse (counts VII

through XX). As charged in this case, a person commits predatory criminal sexual assault of a child if that person is age 17 or older and commits an act of sexual penetration with a victim who is under the age of 13. 720 ILCS 5/11-1.40(a)(1) (West 2016). Further, "[a] person commits criminal sexual assault if that person commits an act of sexual penetration and" he or she is a family member of the victim, who is under the age of 18. *Id.* § 11-1.20(a)(3). Finally, a person commits aggravated criminal sexual abuse if he or she (1) is age 17 or older and "commits an act of sexual conduct with a victim who is under 13 years of age" or (2) commits an act of "sexual conduct with a victim who is at least 13 years of age but under 17 years of age and the person is at least 5 years older than the victim." *Id.* § 11-1.60(c)(1)(i), (d).

¶ 76 In this case, the State alleged that defendant sexually abused B.A., his stepdaughter, from the ages of 9 to 13. Evidence at trial showed B.A. was born in July 2002 and that defendant was born 27 years earlier in July 1975. Clearly, the State's evidence was sufficient to meet elements of the offenses related to defendant's age and his relationship to B.A., and defendant makes no argument to the contrary. Instead, as stated, defendant initially contends the evidence presented failed to support elements of the offenses related to B.A.'s age. We disagree.

¶ 77 At the time of trial, B.A. was a couple of weeks shy of her seventeenth birthday. Although she could not recall specific dates or the precise number of times she was abused, she did provide details regarding where she was living when the acts she described occurred, as well as her year in school. Evidence established that from 2007 until the summer of 2014 when B.A. turned 12, the family lived in a house on Shonna Drive. B.A. provided details of events that occurred at the Shonna Drive residence, stating defendant showed her pornography while living there, which she recalled thinking about when she was in the third grade. Other acts occurring at that residence included defendant rubbing B.A.'s vagina under her clothing and defendant

touching B.A.'s breasts.

¶ 78 In the summer of 2014, when B.A. turned 12 and before she entered the sixth grade, her family, including defendant, moved to a house on Mintler Drive. B.A.'s testimony showed that at the Mintler Drive residence, defendant rubbed the inside and outside of her vagina with his hands, touched the inside of her vagina with his fingers, made her touch his penis with her hand, touched her breasts with his hands and penis, penetrated her vagina with his tongue, ejaculated on her stomach and face, touched her face with his penis, and rubbed his penis on her vagina and between her labia. According to B.A., all of the sex acts she described at trial occurred more than once. Finally, her testimony indicated that those sex acts continued until B.A. realized they were wrong and began locking her bedroom door, which occurred at the beginning of seventh grade and after she had turned 13.

¶ 79 When viewing the evidence presented in the light most favorable to the State, it was sufficient to show that each alleged sex act occurred multiple times and before and after B.A.'s thirteenth birthday. Accordingly, the State's evidence was sufficient to support each element of the charged offenses, including B.A.'s age at the time of each offense.

¶ 80 As stated, defendant also argues the evidence was insufficient because proof of his guilt was based primarily on B.A.'s testimony and she was an incredible witness. Initially, he asserts that B.A. was not credible due to her lack of memory, noting she was unable to recall the number of times anything happened or her age or grade when the abuse first began. Again, we disagree.

¶ 81 First, as argued by the State, given that defendant's abuse of B.A. was alleged to have occurred over a lengthy period of time, beginning when B.A. was young, it is not surprising that her testimony lacked specificity as to the precise timing of events. See *People v. Cerda*, 2014

IL App (1st) 120484, ¶ 166, 7 N.E.3d 201 ("As the victim testified, [the] defendant's abuse occurred a couple of times a week, every week that she was home, for a year and a half. In light of the sheer number of times and the frequency, it is not surprising that she could not recall the exact details of each specific act."). Second, B.A. herself explained her lack of specificity, stating at trial that she could not say with certainty how many times the acts happened because they "happened so many times." Third, she did ultimately provide time frames in which the abuse occurred by relating the acts to where the family was living at the time, testifying that the sex acts she described seemed like they happened "[e]very night" when she was in the sixth grade, and indicating knowledge of when the abuse began because she remembered thinking about defendant showing her pornography when she was in third grade.

¶ 82        Defendant also challenges B.A.'s credibility on the basis that she could not remember whether she "disclosed anything at all to Nancy." However, the record does not support this assertion. Instead, although B.A. had difficulty remembering precisely when her disclosure to Nancy occurred, she clearly testified on both direct and cross-examination that it did occur.

¶ 83        Defendant next argues that B.A. was not a credible witness because her testimony was contradictory and inconsistent with other evidence. He contends B.A. admitted that she "felt close" to Nancy on cross-examination but then denied that they had a close relationship on redirect examination. However, we find that when viewed in context and as a whole, B.A.'s testimony regarding her relationship with Nancy was not contradictory.

¶ 84        On cross-examination, B.A. agreed that she "had a pretty good relationship" with Nancy and that when Tabatha was unavailable, Nancy would sometimes take her to appointments or pick her up from school. When asked by defendant's counsel whether she and Nancy "had a pretty close relationship," B.A. responded: "I guess." On redirect examination, the State noted

B.A. appeared to think before giving the latter response and B.A. explained it was because "[w]e weren't really close." Ultimately, B.A.'s testimony on cross-examination fell short of establishing that B.A. "felt close" with Nancy as claimed by defendant. Instead, she simply acknowledged that the two had a "good relationship" and gave a hesitant response to a question regarding whether they were "pretty close." B.A.'s testimony on redirect examination served only to clarify her earlier hesitation.

¶ 85        Defendant also asserts that B.A.'s testimony regarding her attempts to end the abuse by staying in her bedroom, locking her bedroom door, "and not really being a part of the family" was "refuted" by other evidence, including testimony from his parents that that they did not observe B.A. distancing herself from defendant. First, we disagree that the testimony defendant cites was necessarily contradictory. That B.A. did not take the observable action of locking herself in her bedroom at family gatherings or when defendant's parents were visiting does not necessarily mean that she did not try to avoid defendant or distance herself from him on occasions when there were no visitors and she was more likely to encounter defendant alone and be subjected to abuse. Second, as indicated, reversal is not required even when contradictory evidence is presented at trial. *Gray*, 2017 IL 120958, ¶ 36 ("A conviction will not be reversed simply because the evidence is contradictory ***."). Thus, assuming B.A.'s testimony was contradicted by other evidence, it was the jury's responsibility to resolve those conflicts. In this instance, a rational trier of fact could have found B.A.'s testimony credible.

¶ 86        Finally, defendant argues B.A.'s testimony was not credible because she reported previously undisclosed information at trial that defendant had placed his penis in her mouth. However, the record reflects that B.A. acknowledged not previously reporting that information. She also stated that there were times she felt like what had occurred with defendant was her fault

and that she did not want others to know all that had happened to her. B.A. explained that she finally made a full disclosure at trial because the day of her testimony was the day to "get everything out." Thus, the jury could have determined that B.A. previously experienced shame and embarrassment over the abuse, which kept her from fully disclosing all of details. Accordingly, B.A.'s disclosure of new information did not necessarily render her testimony incredible.

¶ 87    Ultimately, we find no merit to defendant's contention that the evidence presented was insufficient to sustain his convictions for the charged offenses. B.A. testified regarding the abuse she suffered during the time frames and in the manners alleged by the State. Although defendant challenges B.A.'s credibility, we disagree that her testimony was so lacking in specificity, full of inconsistencies, or contradictory to other evidence that it was wholly unworthy of belief by the trier of fact. The cause authority relied upon by defendant is clearly distinguishable from what occurred in the present case. See *People v. Schott*, 145 Ill. 2d 188, 206-07, 582 N.E.2d 690, 699 (1991) (finding a victim's testimony "so lacking in credibility that a reasonable doubt of [the] defendant's guilt remain[ed]" where the victim admitted she lied frequently, "was impeached numerous times," had testimony that was "fraught with inconsistencies and contradictions," and had a motive to falsely accuse the defendant).

¶ 88    Additionally, not only could a rational trier of fact have found B.A. testified credibly regarding the abuse she suffered, other evidence in the record supported her testimony. Specifically, Tabatha testified that defendant acknowledged to her that he had inappropriately touched B.A. Also, defendant's text messages to Tabatha and Nancy showed consciousness of his guilt. The text messages were sent around the time of B.A.'s disclosure of abuse in October 2017 and the involvement of law enforcement. In the texts, defendant did not deny that the abuse occurred. Instead, he expressed concern over what others knew and the involvement of legal

authorities, stated he did not "expect to be lied for," indicated he was suicidal, apologized and asked Tabatha to tell B.A. it was not her fault, acknowledged that he could go to jail, and indicated that his abuse of B.A. was "never about her being young" but because of his depression and a "sex addiction." Thus, we find no merit to defendant's challenge to the sufficiency of the evidence.

¶ 89                    D. Ineffective Assistance of Counsel

¶ 90         On appeal, defendant further argues his trial counsel, Geisler, provided ineffective assistance. Specifically, he contends Geisler was ineffective for failing to argue the materiality of the mental health records defendant sought, seek "a corrective jury instruction" following the reference to B.A.'s suicidal remark, and conduct redirect examination to rehabilitate defendant's witnesses.

¶ 91         Ineffective-assistance-of-counsel claims are judged under the two prong standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), requiring that a defendant demonstrate that (1) his attorney's representation fell below an objective standard of reasonableness and (2) a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *People v. Peterson*, 2017 IL 120331, ¶ 79, 106 N.E.3d 944. "A failure by the defendant to satisfy either prong of the *Strickland* standard precludes a finding of ineffective assistance of counsel." *Id.*

¶ 92         Further, "[t]o establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy." *People v. Perry*, 224 Ill. 2d 312, 341-42, 864 N.E.2d 196, 214 (2007). "[A] mistake in trial strategy or an error in judgment by defense counsel will not alone render representation constitutionally defective." *Peterson*, 2017 IL 120331, ¶ 80. Instead, "[o]nly if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will

ineffective assistance of counsel be found." (Internal quotation marks omitted.) *Id.* Further, under the prejudice prong, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." (Internal quotation marks omitted.) *Id.* ¶ 79.

¶ 93        Here, defendant has failed to establish that Geisler was ineffective. First, he asserts that Geisler's performance was objectively unreasonable in seeking B.A.'s mental health records because he failed to emphasize "the fact that the mere existence of those records affected B.A.'s credibility." However, as discussed, defendant was required to do more than simply show the existence of such records to obtain access to them. Rather, he had to establish that those records were relevant and material to the issue of her credibility. As argued by the State, Geisler's performance cannot be deemed deficient for failing to make a futile argument.

¶ 94        In his reply brief, defendant additionally argues that Geisler should have presented evidence in connection with his request for B.A.'s records and argued their relevancy to the trial court. However, assuming Geisler's performance was deficient in these respects, defendant has failed to establish any prejudice. In particular, we note that he has failed to set forth any specifics as to what evidence he alleges his counsel should have presented or arguments he should have made. Thus, under the circumstances presented, we cannot find a reasonable probability that the result of the proceedings would have been different absent the alleged deficient performance.

¶ 95        Second, defendant argues Geisler was ineffective for failing to seek a "corrective" or "limiting" jury instruction following the reference in the text messages to B.A.'s suicidal statement. Here the record shows Geisler elected not to offer a curative instruction to the jury on the basis that it might draw unwanted attention to the reference. See *People v. Peel*, 2018 IL App (4th) 160100, ¶ 52, 115 N.E.3d 982 (noting the failure to request a limiting instruction may be the result of a strategic decision to avoid drawing attention to certain evidence). Counsel's decision

was clearly one of trial strategy. Further, as the challenged reference was brief, isolated, and not the focus of the State's inquiry when it was elicited, defendant cannot establish that Geisler's strategy was "so unsound" that it resulted in no meaningful adversarial testing of the State's case.

¶ 96 Third, defendant argues Geisler was ineffective for failing to rehabilitate his witnesses. Specifically, he notes that at trial, his parents, Nancy and Randy, offered testimony to refute B.A.'s testimony regarding both her disclosures of abuse and her attempts to distance herself from defendant. On cross-examination, the State elicited testimony that Nancy and Randy loved defendant and did not want to see anything bad happen to him. Defendant points out that Geisler did not conduct any redirect examination of either witness to establish that, although they loved defendant, they would not lie for him under oath.

¶ 97 Here, even assuming Geisler's performance was deficient as alleged by defendant, we, again, find that he has failed to establish prejudice. The State presented strong evidence of defendant's guilt. Its evidence included not only sufficiently detailed testimony from B.A., but also Tabatha's testimony that defendant acknowledged touching B.A. inappropriately and compelling circumstantial evidence in the form of defendant's text messages to both Tabatha and his mother. Given the evidence presented, confidence in the outcome of his trial is not undermined by Geisler's decision not to conduct redirect examination of defense witnesses and confirm the truthfulness of their testimony.

¶ 98                                    E. Excessive Sentence Claim

¶ 99 Finally, on appeal, defendant argues the sentence imposed by the trial court was excessive. He contends his aggregate 74-year sentence was greatly at variance with the spirit and purpose of the law, the court erred in its findings as to the applicable statutory aggravating and mitigating factors, and the court placed undue emphasis on the need for deterrence.

¶ 100       Under the Illinois Constitution, "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "In determining an appropriate sentence, a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment, must be equally weighed." (Internal quotation marks omitted.) *People v. Lawson*, 2018 IL App (4th) 170105, ¶ 33, 102 N.E.3d 761. On review, we will not reverse the sentence imposed by the trial court absent an abuse of discretion. *People v. Pina*, 2019 IL App (4th) 170614, ¶ 20, 143 N.E.3d 794. Further, "[a] sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *Id.* at 54.

¶ 101       Here, defendant was convicted of 20 sex-related offenses against his minor stepdaughter, including 3 Class X felony offenses (counts I through III), subjecting him to a sentencing range of 6 to 30 years in prison (730 ILCS 5/5-4.5-25 (West 2016)); 3 Class 1 felony offenses (counts IV through VI), subjecting him to a sentencing range of 4 to 15 years in prison (*id.* § 5-4.5-30); and 14 Class 2 felony offenses (counts VII through XX), subjecting him to a sentencing range of 3 to 7 years in prison (*id.* § 5-4.5-35). At sentencing, the parties represented to the court that defendant faced a total minimum sentence of 33 years in prison and a total maximum sentence of 120 years in prison. Defendant does not dispute that sentencing range on appeal.

¶ 102       Initially, we address defendant's contention that the trial court erred in its findings as to the applicable factors in aggravation and mitigation. Here, the record reflects that when imposing defendant's 74-year sentence, the court relied on factors in aggravation including (1) that the offenses caused or threatened serious harm, both physical and emotional to B.A.; (2) the need

for deterrence; and (3) that defendant held a position of trust over B.A. It also determined that the only applicable statutory mitigating factor was defendant's lack of a criminal history.

¶ 103 Defendant argues the trial court's "findings in aggravation" were "against the evidence" because no evidence of "serious harm" to B.A. was presented at trial or sentencing. The State argues defendant failed to raise this claim in his motion to reconsider his sentence and, as a result, it has been forfeited. See *People v. Hillier*, 237 Ill. 2d 539, 544, 931 N.E.2d 1184, 1187 (2010) ("[T]o preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required."). Although defendant did not raise this specific issue in his motion to reconsider, he did argue that the trial court failed to properly weigh factors in mitigation, including that his conduct neither caused nor threatened serious physical harm. Under these circumstances, the arguments are sufficiently related and we decline to find forfeiture.

¶ 104 Addressing the merits of defendant's claim, we note that when imposing a defendant's sentence, the trial court may consider as a factor in aggravation that "the defendant's conduct caused or threatened serious harm." 730 ILCS 5/5-5-3.2(a)(1) (West 2016). "[P]sychological harm inflicted upon a child victim of a sex crime is a proper factor to consider in aggravation." *People v. Bunning*, 2018 IL App (5th) 150114, ¶ 18, 103 N.E.3d 864. As argued by the State, victim impact statements presented at sentencing provided evidence regarding the psychological harm B.A. suffered as a result of defendant's actions. Further, we note that several of the underlying offenses involved penetrative sexual acts by defendant against a minor under the age of 13. Thus, the trial court, in its discretion, could have concluded that defendant's conduct at least threatened serious physical harm to B.A.

¶ 105 Defendant also argues the trial court improperly emphasized the need for

deterrence. He asserts the court's consideration of the deterrent factor punished him for the tendencies of others rather than his own conduct and was already built into the statutory sentencing ranges for the offenses at issue. We note, however, that whether a "sentence is necessary to deter others from committing the same crime" is a proper statutory aggravating factor for the court to consider. 730 ILCS 5/5-5-3.2(a)(7) (West 2016). Here, the record shows the court relied on the need for deterrence but does not reflect that it gave that factor any undue consideration or weight. Accordingly, we find no abuse of the court's discretion.

¶ 106    Defendant next argues the trial court erred in failing to find several statutory mitigating factors were applicable to his case, including that (1) his criminal conduct neither caused nor threatened serious physical harm to another (*id.* § 5-5-3.1(a)(1)), (2) he did not contemplate that his criminal conduct would cause or threaten serious physical harm to another (*id.* § 5-5-3.1(a)(2)), (3) he was willing to compensate B.A. for the injuries she sustained (*id.* § 5-5-3.1(a)(6)), (4) his criminal conduct was the result of circumstances unlikely to recur (*id.* § 5-5-3.1(a)(8)), and (5) his imprisonment would entail an excessive hardship to his dependents (*id.* § 5-5-3.1(a)(11)).

¶ 107    Once more, the State asserts that some of the points raised by defendant regarding the factors in mitigation have been forfeited because he did not raise the specific arguments he now raises on appeal in his postsentencing motion. Again, however, defendant did argue in his motion to reconsider that the trial court failed to "adequately weigh" statutory mitigation factors, including those he lists on appeal. We find defendant's claims both in his postsentencing motion and on appeal are sufficiently similar and have not been forfeited as alleged by the State. Accordingly, we address the merits of defendant's claim.

¶ 108    "When factors in mitigation are presented and argued to the sentencing judge, they

are presumed to have been considered, absent some showing to the contrary." *People v. Parker*, 288 Ill. App. 3d 417, 423, 680 N.E.2d 505, 508 (1997). The trial court is not required to explicitly state its consideration of each factor it considers or the weight it assigns to each factor. *People v. Halerewicz*, 2013 IL App (4th) 120388, ¶ 43, 2 N.E.3d 333. Further, "[i]n considering the propriety of a sentence, the reviewing court must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *People v. Fern*, 189 Ill. 2d 48, 53, 723 N.E.2d 207, 209 (1999).

¶ 109    Here, the circumstances of the underlying offenses involved defendant's sexual abuse of his stepdaughter, B.A., over a period of several years, beginning around the time she was nine years old. As stated, several of the offenses involved penetrative sexual acts against a minor under the age of 13, from which the trial court could have found the threat and contemplation of serious physical harm. Additionally, evidence showed the mental and emotional toll that years of abuse had on B.A. Although defendant's counsel argued defendant was willing to provide "restitution" for B.A.'s counseling expenses, counsel's assertions during his argument did not constitute *evidence*. Moreover, we find the court would not have abused its discretion in finding such an assertion by defendant was hollow on the basis that he could never fully compensate B.A. for his crimes against her. See *People v. Primmer*, 111 Ill. App. 3d 1046, 1052, 444 N.E.2d 829, 834 (1983) ("The trial court's statement that defendant could never compensate the victims for their mental anguish was not a violation of the requirement that it consider in mitigation defendant's stated intention to pay for the damage he had caused.").

¶ 110    Additionally, although defendant asserts the trial court should have determined his criminal conduct was the result of circumstances unlikely to recur, the evidence presented at sentencing, including evidence that defendant also engaged in inappropriate behavior with B.A.'s

younger sister, did not require such a finding. Finally, we note that no evidence was presented to support defendant's claim on appeal that his imprisonment would entail an excessive hardship to his dependents.

¶ 111    In this instance, although the trial court did not make explicit findings regarding each statutory mitigating factor, the record reflects it did consider them, finding the only one that applied was defendant's lack of any significant criminal history. We find no abuse of discretion by the court with respect to that determination.

¶ 112    Finally, given the nature of the offenses at issue and the evidence presented, we also find no merit to defendant's contention that his 74-year sentence is excessive because it was greatly at variance with the spirit and purpose of the law. Defendant's argument is essentially based on claims that the trial court erred with respect to its findings as to the applicable statutory factors in aggravation and mitigation and due to the manner in which it weighed the evidence presented. However, as discussed, the court's findings as to applicable factors does not reflect an abuse of discretion and it is not the function of this court to reweigh the evidence. Accordingly, we find no merit to defendant's excessive-sentence claim.

¶ 113                                  III. CONCLUSION

¶ 114    For the reasons stated, we affirm the trial court's judgment.

¶ 115    Affirmed.